**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 23 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LYNDA LIPS,

      Plaintiff - Appellant,

  v.

AMERICAN COMMUNITY MUTUAL
INSURANCE COMPANY,

      Defendant - Appellee.

No. 97-1139

(D.C. No. 96-WY-774-AJ)

(Colorado)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, and **HENRY**, Circuit Judges, and **BRETT**, District Judge[**].

     In this diversity action, Lynda Lips appeals the district court's order granting

summary judgment against her and in favor of American Community Mutual Insurance

Company (American Community) on her claims for breach of contract, breach of an

implied covenant of good faith and fair dealing, negligent performance of an insurance

---

    [*]   This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

    [**]   The Honorable Thomas Brett, United States District Judge for the Northern
District of Oklahoma, sitting by designation.

contract, extreme and outrageous conduct, intentional infliction of emotional distress, and exemplary damages.  We exercise jurisdiction under 28 U.S.C. § 1291, vacate the district court's order granting summary judgment to American Community, and remand for further proceedings.

## I.  BACKGROUND

In February 1994, Ms. Lips met with insurance agent David Miller to apply for health insurance coverage with American Community.  Mr. Miller supplied a written application for coverage, which requested information regarding Ms. Lips's medical history.  He reviewed the application with Ms. Lips, asked her for the requested information, and filled in the answers himself.

Four questions on the insurance application are relevant to this case.  Question 7A asks, "To the best of your knowledge and belief, do you have any physical, dental related, mental, nervous, emotional, or personality disease, disorder, irregularity or abnormality, any eating disorder, any deformity, or any congenital abnormality?" Aplt's App. at 173.  Question 7B asks,  "Have you been examined, advised or treated by any physician, therapist, psychologist, chiropractor, or other practitioner or been hospitalized for any reason within the past 10 years?" Id.  Question 7I asks, "Have you had any symptoms or condition for which you intend to seek medical advice or treatment?"  Id.   Finally, question 7K asks, "Are you currently taking medication, or have you taken any

2

medication in the last 5 years for any reason?" Id. The application states that if any of these questions is answered affirmatively, the applicant should "state full information in [the] chart below." Id.

Ms. Lips answered "no" to questions 7A and 7I, "yes" to questions 7B and 7K, and provided brief explanations of her affirmative answers. As to question 7B, her application states that she had seen Dr. Jack Ford, a gynecologist for symptoms related to "change of life." Id. The application states that Dr. Ford prescribed estrogen and progesterone and that her symptoms were in "good control" and that there were "no major problem[s] [and] no conditions etc." Id. She supplemented her "yes" answer to question 7K (regarding medications) as follows: "estrogen[,] progesterone--see 7B." Id.

In March 1994, American Community accepted Ms. Lips's application and began providing health insurance to her. In March 1995, after a medical consultation, Ms. Lips decided to have surgery to remove silicone breast implants. She filed a request for preapproval of insurance coverage for the surgery with American Community. Because information regarding the implants had not been disclosed in Ms. Lips's initial application for coverage, American Community obtained Ms. Lips's medical records from her treating physicians.

In reviewing Ms. Lips's medical records, American Community discovered that, in February 1995, in preparation for the implant removal surgery, Ms. Lips had been examined by Dr. Pamela Aschenbrener. In her written report of the examination, Dr.

3

Aschenbrener stated that Ms. Lips received the implants in 1972, that she suffered from "the gradual onset of arthralgias, myalgias, weakness and fatigue, and depression, as well as mental status changes," and that she had "a scleroderma like disease." Id. at 32. According to Dr. Aschenbrener, Ms. Lips reported that she had suffered from muscle weakness and a constant decrease in her energy level over the past fifteen years. These symptoms resulted in Ms. Lips "becoming partially disabled in her work, with the percent of disability increasing as the symptoms are worsening." Id. at 32. Dr. Ashenbrener concluded that Ms. Lips was "rapidly progressing towards a total disability." Id.

From its review of her medical records, American Community also discovered that Ms. Lips had failed to list several physicians and medications on her insurance application. In particular, American Community learned that, in 1987, a Dr. Weller had diagnosed Ms. Lips as suffering from depression. In 1993, Dr. Ford (whom Ms. Lips had listed on the application) had diagnosed her as suffering from depression and prescribed Elavil. Ms. Lips had not listed Dr. Ford's prescription for Elavil on the American Community application. Finally, the records indicated that, in 1993, a Dr. Brightwell had prescribed Lasix for leg swelling.

In June 1995, after reviewing these records, American Community sent Ms. Lips a letter rescinding her policy. The letter stated that the policy would not have been issued if she had disclosed her complete medical history on the initial application. American Community refunded Ms. Lips's premiums, less the amount of benefits that it had already

4

paid to her.  In July, David Miller, the agent who had sold Ms. Lips the policy, sent a letter to American Community protesting the rescission.  Although he acknowledged that he had not reviewed all of Ms. Lips's medical records, Mr. Miller recounted Ms. Lips visits to Dr. Ford and noted that Dr. Ford had told her that she was suffering normal symptoms of menopause.  According to Mr. Miller, Ms. Lips's answers to the questions on the initial application were truthful:

> I think Lynda Lips answered our questionnaire truthfully on 2-22-94 because she was told that all her complaints were "minor" & "normal" for a menopausal woman & that all tests confirmed that diagnosis. She was basically put in the position of being a hypochondriac if she indicated on our application that anything other than menopause was going on.  Lynda had been told by her doctor that she was normal for her age & that is what she indicated on her application.

Id. at 82-83.

Mr. Miller's request for reconsideration was not successful.  In September 1995, American Community sent a letter to Ms. Lips reaffirming its decision to rescind the policy.  The letter explained that the policy had been rescinded because she had failed to disclose that she "[had] been diagnosed and treated for depression, had symptoms of arthralgias, myalgia, weakness, fatigue and a scleroderma like disease." Id. at 58.

Following American Community's rescission of the policy, Ms. Lips filed the instant diversity action.  In granting summary judgment to American Community, the district court applied Colorado law and concluded that American Community had

established the elements necessary to rescind the policy on the basis of misrepresentations in Ms. Lips's application. As a result, the court said, American Community was entitled to summary judgment on Ms. Lips's breach of contract claim. The court also granted summary judgment to American Community on Ms. Lips's tort claims, concluding that American Community had acted reasonably.

## II. DISCUSSION

We review the district court's decision de novo, applying the same standard for granting summary judgment as the district court, see Fed. R. Civ. P. 56; Zinn v. McKune, 143 F.3d 1353, 1356 (10th Cir. 1998), and the substantive law of Colorado, see Farmers Alliance Mut. Ins. Co. v. Salazar, 77 F.3d 1291, 1294 (10th Cir. 1996). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "We view the evidence and draw any inferences therefrom in the light most favorable to the party opposing summary judgment." Coosewoon v. Meridian Oil Co., 25 F.3d 920, 929 (10th Cir. 1994). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,' summary judgment in favor of the moving party is proper." Thomas v. International Bus. Machs., 48 F.3d 478, 484 (10th Cir. 1995) (quoting Matsushita Elec. Indus. Co. v. Zenith

6

Radio Corp., 475 U.S. 574, 587 (1986)).


## A.  Breach of Contract Claim

Ms. Lips first challenges the district court's grant of summary judgment in favor of American Community on her breach of contract claim.  The district court based its ruling on Hollinger v. Mutual Benefit Life Ins. Co., 560 P.2d 824, 827 (Colo. 1977), in which the Supreme Court of Colorado concluded that an insured's misrepresentations on an application may provide an insurer with grounds to rescind a policy.  Under Hollinger, in order to properly rescind a policy on the basis of such misrepresentations, an insurer must establish the following elements:  (1) the applicant made a false statement or concealed a fact; (2) the applicant made the false statement or concealed the fact knowingly; (3) the false statement or concealed fact was material to the issuance of the policy or the risk undertaken by the insurer; (4) the insurer had no knowledge of the false statement or concealed fact and is not chargeable with knowledge; and (5) the insurer relied to its detriment on the false statement or concealed fact in issuing the insurance policy.  Id. at 527.  If an insurer establishes these elements, then the insured's misrepresentations constitute an affirmative defense to claims to recover under the policy.  See Murray v. Montgomery Ward Life Ins. Co., 584 P.2d 78, 80 (Colo. 1978) (en banc).  In this appeal, we consider the first, third, and fifth elements of American Community's rescission defense.

## 1. Truthfulness of Ms. Lips's Answers

In concluding that American Community had established the first element of its rescission defense (that Ms. Lips made a false statement or concealed a material fact on her application), the district court cited Ms. Lips's responses to Questions 7A, 7B, 7I and 7K. As to Question 7A (concerning diseases, disorders, and abnormalities), the court said that she answered falsely because she did not disclose "that she had been diagnosed as suffering from depression in 1987 by Dr. Weller and in 1993 by Dr. Ford," Aplt's App. at 113. As to question 7B (concerning treatment by physicians), it concluded that Ms. Lips had answered falsely because she had not reported that she had seen Drs. Weller and Brightwell in the previous ten years. As to question 7I (concerning symptoms for which she intended to seek treatment), the court said that Ms. Lips had answered falsely because she had not stated that "she had been suffering from depression, had leg swelling, breast tenderness, and chronic fatigue." Id. Finally, as to Question 7K (concerning medications), the court said that Ms. Lips had answered falsely because she had not indicated that she had taken Lasix and Elavil within the previous five years.

Ms. Lips contends that the district court erred in concluding that her answers regarding her medical history on the initial application were not truthful. She begins by parsing question 7A, arguing that the district court erroneously changed the tense of the question. She notes that the district court quoted question 7A as stating "whether, to the

8

best of Applicant's knowledge and belief, the Applicant <u>had</u> any physical, dental related, mental, nervous, emotional or personality disease, disorder . . . ." Aplt's App. at 107 (emphasis added). Ms. Lips observes that the question actually asks about present illnesses; it asks, "[D]o you <u>have</u> any [diseases or disorders]." <u>See</u> <u>id.</u> at 173 (emphasis added). Thus, according to Ms. Lips, because she was not suffering from depression at the time she answered question 7A on the application and because (as she reported on the application) Dr. Ford had told her that she was only suffering from normal symptoms of menopause, her "no" answer was neither false nor misleading.

As to question 7I, Ms. Lips notes that it asks, "Have you had any symptoms or condition for which you intend to seek medical advice or treatment?" <u>Id.</u> Ms. Lips contends that merely because she had been advised to see another doctor does not establish that she actually intended to do so. Accordingly, she contends, her "no" answer to question 7I was also neither false nor misleading. <u>See</u> Aplt's Opening Br. at 9 ("[B]eing <u>advised</u> to see another doctor and being <u>referred</u> to another doctor is not the same as the present <u>intent</u> to see any doctor.").

Ms. Lips takes a different approach to question 7B (regarding treatment by physicians over the previous ten years) and 7K (regarding medications taken over the last five years). As to these questions, Ms. Lips contends that the June 1995 letter from Mr. Miller to American Community raises controverted issues of material fact as to whether her answers were truthful. She cites Mr. Miller's explanation of her visit to Dr. Ford and

9

Dr. Ford's conclusion that she was suffering normal effects of menopause. She emphasizes the statement in Mr. Miller's letter that she answered the questions truthfully.

In response to Ms. Lips's arguments, American Community contends that the district court properly found that she had not answered the questions truthfully. However, in addition to the omissions cited by the district court, American Community argues that Ms. Lips answered Question 7A falsely because she "failed to disclose her serious longstanding medical problems which included chronic fatigue, depression, leg swelling, skin changes, spastic colitis, heart murmur, muscle and joint pain, blurred vision, loss of word finding and memory, and difficulty with gait and balance." Aple's Br. at 11. American Community appears to have taken this summary of Ms. Lips's symptoms from the February 1995 report of Dr. Aschenbrener, who evaluated Ms. Lips in preparation for implant removal surgery. See Aplt's App. at 32-38.

Upon review of Ms. Lips's application and the evidence in the record concerning her medical history, we agree with the district court as to questions 7B and 7K but not as to questions 7A and 7I. With regard question 7A , we agree with Ms. Lips that this question may reasonably be read as inquiring about present illnesses. In our view, it was not necessarily false or misleading for Ms. Lips to answer "no" to question 7A merely because she had been diagnosed with depression in the past. She may have reasonably believed that a past diagnosis of depression was no longer applicable, and American Community has not established that Ms. Lips was depressed when she completed the

application in February 1994. Moreover, Ms. Lips has indicated that Dr. Ford had told her that she was suffering from normal symptoms of menopause, and she reported that diagnosis on her application. See id. at 74, 173.

Additionally, we do not agree with American Community that it has demonstrated that Ms. Lips answered Question 7A falsely by failing to disclose "her serious longstanding medical problems." See Aple's Br. at 11. As we have noted, American Community's summary of these problems appears to be based on Dr. Aschenbrener's report, which was written in February 1995, well after Ms. Lips completed the American Community application in February 1994. The fact that Dr. Aschenbrener chronicled these symptoms in February 1995 does not establish as a matter of law that they all constituted "disease[s], disorder[s], irregularit[ies] or abnormalit[ies]," see Aplt's App. at 173, from which Ms. Lips knew that she was suffering in February 1994 and that she should have reported them to American Community in her application. Because Ms. Lips submitted an affidavit stating that, in February 1994, "the only diagnosis that I had been given for all of my medical conditions was that of change of life as reflected in the medical history and records of . . . Dr. Jack Ford," id. at 74, there is evidence in the record supporting her contention that she answered Question 7A truthfully.

We are similarly unpersuaded by the interpretation of Question 7I advanced by American Community. We agree with Ms. Lips that this question asks about her intent to seek treatment for symptoms and conditions; it does not directly ask about symptoms and

11

conditions themselves.  Accordingly, Ms. Lips's negative response may reasonably be read to indicate only that she did not intend to seek treatment. American Community has not established that this statement regarding her intent was false.

However, we do agree with the district court that Ms. Lips falsely answered questions 7B and 7K.  It is uncontroverted that Ms. Lips did not mention two physicians who had treated her (Drs. Brightwell and Weller) and two medications that she had taken (Elavil and Lasix).  Moreover, Ms. Lips has not provided an adequate explanation of her failure to provide this information.  In deposition testimony, after acknowledging that she had seen Drs. Brightwell and Weller and that she had taken Lasix and Elavil, Ms. Lips stated that she had not listed Elavil because she had only taken it for a month or two and because she did not believe that she was depressed.  See Aplt's App. at 163.  She also explained that she had only seen Dr. Brightwell once.  Neither explanation supports her contention that her responses to Questions 7B and 7K were truthful.  These questions ask for information about all physicians and medications, and they do not excuse the applicant from providing information if she disagreed with the physician's diagnosis, if she was only treated by the physician on one occasion, or if she took the medication infrequently.

Moreover, we are not convinced that Mr. Miller's July 1995 letter raises controverted issues of material fact regarding the truthfulness of Ms. Lips's answers to Questions 7B and 7K.  In the letter and in subsequent deposition testimony, Mr. Miller acknowledges that when he characterized Ms. Lips's answers as truthful, he had not

12

reviewed her medical records. Thus, he did not know that Ms. Lips had seen Dr. Weller and Dr. Brightwell and that they had prescribed Elavil and Lasix. Accordingly, Mr. Miller's statements about Ms. Lips's truthfulness in answering these questions lack a proper foundation and are thus inadmissible. See Fed. R. Evid 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); United States v. Dotson, 799 F.2d 189, 192-93 (5th Cir. 1986) (noting that "[a]n opinion, or indeed any form of testimony, without the underlying facts, may be excluded if it amounts to no more than a conclusory observation" and holding that testimony of law enforcement agents about witnesses' lack of truthfulness should not have been admitted absent "some underlying basis to demonstrate that the opinions were more than bare assertions"). Thus, the district court properly refused to consider Mr. Miller's letter in assessing the truthfulness of Ms. Lips's responses to questions 7B and 7K.[1]

In summary, we conclude that there are controverted factual issues regarding the truthfulness of Ms. Lips's responses to questions 7A and 7I. However, we agree with the district court that the record establishes as a matter of law that Ms. Lips answered questions 7B and 7K falsely.

---

[1]     Significantly, in his deposition testimony, after having reviewed Ms. Lips's medical records, Mr. Miller acknowledged that "I don't think she necessarily filled out that application completely correctly, in  hindsight." Aplt's App. at 201.

13

2.  Materiality of False Statements and American Community's Reliance on Them

Ms. Lips also argues that American Community has failed to establish several other elements of its recission defense.  In particular, she contends that American Community has failed to establish that the false statements about her medical history were material to the issuance of her policy, see Aplt's Opening Br. at 23, and that it has also failed to establish that it rescinded the policy because of her false answers, see id. at 11. We read Ms. Lips's brief as challenging both the materiality and reliance elements of American Community's defense.  In light of our conclusion that Ms. Lips falsely answered questions 7B and 7K, we must therefore determine whether American Community has established that these false answers were material to the issuance of the policy and that American Community relied on them.

In concluding that American Community had established these elements, the district court did not identify the particular false statements that it deemed material to the issuance of the policy to Ms. Lips or the particular false statements on which American Community had relied in issuing the policy.  See Aplt's App. at 114-15.   However, in arguing that the district court properly assessed the evidence pertaining to these elements, American Community points to the affidavit of Donna Yemc, one of its senior underwriters.  See Aple's Br. at 14.

Ms. Yemc's affidavit refers to the September 1995 letter from American Community to Ms. Lips explaining the grounds for its rescission of the policy and states

14

that the symptoms and conditions identified in that letter "were material to . . . [the] issuance of the policy." Aplt's App. at 54. Those symptoms and conditions are described in the September 1995 letter as follows:

> During routine claims handling records were obtained from Dr. Aschenbrener, Dr. Ford, Dr. O'Rourke, and Dr. Bland. Information in those records indicated that [Ms. Lips] had multiple symptoms and conditions which were not disclosed on the application. Dr. Aschenbrener's records indicate that [Ms. Lips had] been diagnosed and treated for depression, had symptoms of arthralgias, myalgia, weakness, fatigue and a scleroderma like disease onset age 44, a heart murmur which you were told of on and off during the years, blurred vision, spastic colon, [in] 1987 a worsening of symptoms which included loss of word finding and long and short term memory, difficulties with gait and balance, and continued depression. [Dr. Aschenbrener] also indicated that [Ms. Lips was] seen by multiple physicians none of which were disclosed on [her] application.

Id. at 54, 58. According to Ms. Yemc's affidavit, "[h]ad this information been disclosed on the Application, based upon the underwriting guidelines utilized by American Community, [Ms. Lips's application] . . . would have been denied." Id. at 54.

Some of the information to which Ms. Yemc refers is clearly insufficient to establish the materiality and reliance elements of American Community's recission defense. In particular, three of the four physicians to which the referenced letter alludes-- Dr. Aschenbrener, Dr. O'Rourke, and Dr. Bland--did not treat Ms. Lips until after she completed the American Community application in February 1994. See Aplt's App. at 148, 182. Thus, at the time that Ms. Lips completed the application, she could not have

15

listed these physicians in relating her medical history. As to the fourth physician, Dr. Ford, Ms. Lips has offered evidence that, when she completed the application in February 1994, she disclosed the diagnosis that Dr. Ford had given her (i.e. that she was suffering from normal symptoms of menopause). Because American Community has not established as a matter of law that Ms. Lips made false statements on her application about her treatment by these four physicians, American Community cannot rely on these physicians' records to establish the materiality and reliance elements of its defense on summary judgment.

To be sure, Dr. Aschenbrener's report discusses Ms. Lips's longstanding medical problems and indicates that many of these problems had surfaced before Ms. Lips completed the American Community application (e.g. "arthralgias, myalgias, weakness and fatigue, and depression, as well as mental status changes . . . [and] a scleroderma like disease"). See Aplt's App. at 176. However, as we have noted, in light of the evidence offered by Ms. Lips regarding Dr. Ford's diagnosis of normal symptoms of menopause, American Community has failed to establish as a matter of law that Ms. Lips should have reported these conditions in responding to the questions on the American Community application.

The only other information identified by Ms. Yemc in support of the materiality and reliance elements is that Ms. Lips was "seen by multiple physicians none of which were disclosed on your application." See Aplt's App. at 54, 58. However, although it is

16

uncontroverted that Ms. Lips answered question 7B falsely by failing to list Drs. Brightwell and Weller, Ms. Yemc's affidavit and the referenced letter do not establish that these false responses, <u>standing alone</u>, were material to the issuance of the policy or that American Community relied on these false responses in issuing the policy. In other words, the affidavit and letter do not establish as a matter of law that, if Ms. Lips had reported that she had seen Dr. Brightwell and Dr. Weller, American Community would then have refused to issue the policy to her.[2]

As a result, we conclude that the district court erred in finding that American Community established the materiality and reliance elements of its rescission defense and therefore erred in granting summary judgment to American Community on Ms. Lips's breach of contract claim.[3]

---

[2]    Indeed, if the failure to list every physician one has ever seen and every medication one has ever taken were considered to be material per se, we imagine a great many policies would be rescinded.

[3]    We emphasize that we are not deciding whether American Community acted properly in rescinding Ms. Lips's policy. Instead, we have concluded only that there are controverted issues of material fact regarding: (1) the truthfulness of Ms. Lips responses to questions 7A and 7I; (2) the materiality of Ms Lips's undisputedly false answers to questions 7B and 7K; and (3) American Community's reliance on her undisputedly false answers to questions 7B and 7K. On remand, American Community may be able to establish that Ms. Lips's answer to questions 7A (that she was suffering only from normal symptoms of menopause) and 7I (that she was not suffering from medical symptoms or conditions for which she intended to seek advice or treatment) were knowingly false, that her answers were material to the issuance of the policy, and that American Community relied on those false answers. Alternatively, American Community may be able to establish that the undisputedly false answers given by Ms. Lips (her responses to questions 7B and 7K) were material to the issuance of the policy and that American Community relied on those false statements in issuing the policy.

17

## B. Tort Claims

Ms. Lips also argues that the district court erred in granting summary judgment against her on her tort claims. She points to the July 1995 letter that Mr. Miller sent to American Community urging reconsideration of its decision. According to Ms. Lips, because American Community failed to conduct a sufficient inquiry into the grounds for rescinding Ms. Lips's policy after receiving this letter, there is sufficient evidence in the record to support all of her tort claims.

As noted above, we are not persuaded by Ms. Lips's argument that Mr. Miller's letter raises legitimate questions about the truthfulness of her responses to the questions on the application. Because Mr. Miller admitted that he had not reviewed Ms. Lips's medical records, his opinion that she was truthful in completing the application was entitled to little weight. Accordingly, the fact that Mr. Miller's letter did not lead American Community to conduct a more detailed inquiry into the grounds for rescinding Ms. Lips's policy does not support her tort claims.

Nevertheless, we also note that, in moving for summary judgment on the tort claims, American Community relied on the argument that Ms. Lips's misrepresentations

_____

However, in the record before us, the evidence supporting those elements is controverted, and, as result, the district court erred in drawing conclusions about those elements as a matter of law.

in the application provided a reasonable basis for rescinding the policy. The district court based its grant of summary judgment to American Community on the same proposition. See Aplt's App. at 117. However, as discussed above, there are controverted issues of fact as to whether American Community had a reasonable basis for rescinding the policy. Thus, the record does not support the grant of summary judgment to American Community on Ms. Lips's tort claims on the grounds articulated by the district court and argued by American Community.

Although there may be other defenses to Ms. Lips's tort claims, American Community has not argued in this appeal that these defenses warrant the grant of summary judgment in its favor. Instead, it relies solely on Ms. Lips's misrepresentations. We therefore conclude that the grant of summary judgment to American Community on Ms. Lips's tort claims should be vacated, and that those claims should be remanded for further proceedings.

## III. CONCLUSION

Accordingly, we vacate the district court's grant of summary judgment to American Community and remand the case to the district court for further proceedings consistent with this opinion.[4]

---

[4] The dissent concludes that it "simply cannot accept the majority's rationale that Ms. Lips' failure to disclose these longstanding myriad complaints of poor health is not material to her health insurance application as a matter of law." Dissent at 5. We emphasize that our view is not that Ms. Lips's failure to disclose her longstanding complaints is immaterial, but

Entered for the Court,

Robert H. Henry
Circuit Judge

No. 97-1139, Lynda Lips v. American Community Mutual Insurance Company

**BRETT**, United States District Judge, dissenting:

I respectfully dissent because the uncontroverted evidence reveals plaintiff, Lynda

———————————————

rather that there are controverted issues of material fact as to how those complaints could be reasonably characterized when Ms. Lips completed the American Community application. On the one hand, relying on Ms. Lips's affidavit that she had been given a diagnosis of menopause when she filled out the application but had not been diagnosed with any other major problems, a jury could find that Ms. Lips's statement that she was suffering only from symptoms associated with "change of life" was truthful. On the other hand, relying on Dr. Aschenbrener's after-the-application report, a jury could find that Ms. Lips knew that she was suffering from serious problems (and not just menopause) and that her statement that she was only suffering "change of life" symptoms was false.

The dissent also concludes that Ms. Lips's failure to disclose her prescriptions for Elavil and Lasix was material to the issuance of the policy. However, as we have noted, our view is that the evidence offered by American Community fails to establish that the information about Elavil and Lasix (two rather common drugs), standing alone, was material to the issuance of the policy.

Finally, the dissent concludes that American Community is entitled to summary judgment on Ms. Lips's tort claims. The dissent reasons that, even if the majority were correct that legitimate factual issues exist for the trier of fact on plaintiff's breach of contract claims, "plaintiff's extra-contractual claims cannot proceed because an insurance carrier has a right to litigate a legitimate coverage dispute without being subjected to willful, wanton bad faith claims," Dissent at 10. We agree that an insurer should not be subject to a bad faith claim every time it decides to litigate a coverage dispute. However, the only argument that American Community advances in support of summary judgment on the bad faith claims is that it acted properly in rescinding the policy because of Ms. Lips's false statements. Because there are factual disputes about whether American Community was entitled to rescind the policy, American Community is not entitled to summary judgment on the tort claims on the basis of its alleged entitlement to rescind the policy.

20

Lips, misrepresented material facts concerning her medical history in her health insurance application to American Community Mutual Insurance Company (American Community) in February, 1994.

In his meeting with Ms. Lips in February 1994, David Miller,  Ms. Lips' insurance agent, reviewed the entire application with Ms. Lips and filled in her answers to the questions therein.  Question 7A of the application in essence asks: "To the best of your knowledge and belief, do you have any physical, . . .  mental, nervous, emotional . . . disorder, irregularity or abnormality. . . ."  Ms. Lips answered, "No."    Question 7B on the application asks the following: "Have you been examined, advised or treated by any physician, therapist, psychologist, chiropractor or other practitioner or been hospitalized for any reason within the past 10 years?"  Ms. Lips answered by stating she had seen her gynecologist, Dr. Ford, concerning "change of life" symptoms.  Dr. Ford prescribed estrogen and progesterone and her symptoms were in "good control - no major problem - no conditions, etc."  Question 7K asks, "Are you currently taking medication, or have you taken any medication in the last 5 years for any reason?"  Ms. Lips answered "yes" and stated "estrogen[,] progesterone – see 7B."

Immediately above question 7 in bold type the insurance application states: "Benefits will be paid for a sickness, injury, or condition that existed prior to the time insurance is effective only if such sickness, injury, or condition is fully and completely disclosed on this application . . . ."  In addition, the notice to applicant regarding replacement of or additions to existing accident and sickness insurance states in paragraph 3:   "Questions in the

application for the new policy must be answered truthfully and completely; otherwise, the validity of the policy and the payment of any benefits thereunder may be voided." (Aplt's App. at 00173)

Within one year after the health insurance policy was in force, Ms. Lips sought medical coverage under the policy to pay medical benefits for the surgical removal of breast implants surgically implanted in 1972. Ms. Lips went to Pamela J. Aschenbrener, M.D., who compiled an extensive written report dated February 22, 1995. (Aplt's App. at 0032-0038) Regarding Ms. Lips' complaints and history, Dr. Aschenbrener stated the following, *inter alia:*

> "<u>CHIEF COMPLAINT</u>:
>
> 52 year old female with bilateral silicone breast implants since 1972 with the gradual onset of arthralgias, myalgias, weakness and fatigue, and depression, as well as mental status changes who has a scleroderma like disease that have [sic] resulted in her becoming partially disabled in her work, with the percent of disability increasing as the symptoms are worsening. She is rapidly progressing towards a total diability [sic]. This places hr [sic] with a scleroderma like disease and a Category A severity, onset age 44.
>
> <u>HISTORY OF PRESENT ILLNESS</u>:
>
> Patient is a 52 year old female who had bilateral augmentation mammoplasty with silicone implants and rhinoplasty in March 1972. These were done by Dr. R.C.A. Weatherly-White in Denver, Colorado.
>
> Over the course of that first year, the implants became encapsulated and firm and scarred down. Consequently, she underwent a re-do procedure in December 1972 by the same

surgeon.

The patient reports that over the past fifteen years, she has had a definite decrease in the quality of her life. She has had a decrease in her energy level which is constant, interrupted sleep patterns, with complaints of fatigue, myalgias, arthralgias, and prior to the breast implantation, a history and physical that was done by Dr. Weatherly-White reveals a completely healthy female with a negative review of systems.

In the 1980's, she reports the onset of muscle weakness, which occurred in an episodic type fashion. The muscle pains were everywhere, throughout her entire body. She also reported the onset of some numbness and tingling in her legs and feet, especially her left leg. This leg has had a problem with swelling, off and on, which is rather marked and severe. It is associated with warmth, but without modeling or color changes. She takes PRN diuretics for the problem, and the sensation of numbness and tingling often accompany the swelling.

        *       *       *       *

However, in 1987, she had an acute worsening of all of her symptoms associated with a marked change in her sense of fatigue, which was much worse. The sleep disturbance acutely exacerbated. She was having difficulties with spastic colon/irritable bowel syndrome, and marked mental status difficulties that were very alarming to her, which included loss of word finding, loss of short and long term memory, decreased ability to concentrate and very poor attention span, difficulties with her gait and balance, and consequently, depression.

During that time, she saw multiple physicians to try to get some help for these problems and it was approximately at that time when she was started on Estrogen Replacement Therapy and antidepressants. Her initial diagnosis of depression was made by Dr. Weller. At the time of presentation, she refused medication, but has had difficulties with continued depression.

        *       *       *       *

ASSESSMENT:

Telangiectasia [a vascular lesion formed by dilation of a group of small blood vessels, the basis for a variety of angiomas (a tumor made up of blood vessels or lymph vessels)], Raynaud's Syndrome [intermittent attacks of severe pallor of the fingers or toes and sometimes of the ears and nose, brought on characteristically by cold and sometimes emotion], and history of intermittent dysphagia [difficulty in swallowing]. Her skin changes are very consistent with scleroderma [chronic hardening and shrinking of the connective tissues of any part of the body] with early crest syndrome. Her ANA and scleroderma testing were negative, and consequently she falls into the scleroderma-like disease category. She has multiple complaints of arthralgias [pain in a joint], myalgias [pain in a muscle or muscles], fatigue, weakness, depression, and a scleroderma like syndrome. Her disability is currently approximately 50% and this is only possible because she has the luxury of owning her own business. If she were working for someone else, she would be currently totally disabled. I expect that as her disease progresses, she will be very soon totally disabled.

\* \* \* \*

ADDENDUM:

Dr. O'Rourke's evaluation included MRI of the breasts that revealed bilateral implant leakage."

Ms. Lips revealed her medical history and complaints to Dr. Aschenbrener also in preparation for filing a personal injury damage claim against the manufacturer of her breast implants (Dow). Under oath she confirmed the accuracy of Dr. Aschenbrener's history and written report of her medical examination. (Lips Depo. pp. 38-42, Aplt's App at 00164-00165)

The trial court properly found Ms. Lips' longstanding symptoms and maladies of poor

4

health were material in responding to Question 7A of the insurance application. Although the majority is correct that Dr. Aschenbrener's report was elicited a year after Ms. Lips filed her health insurance application with American Community, the report's extensive litany of Ms. Lips' health maladies and symptoms reveals health problems which were extensive and chronic, and which had persisted for many years. I simply cannot accept the majority's rationale that Ms. Lips' failure to disclose these longstanding myriad complaints of poor health is not material to her health insurance application as a matter of law. Hollinger v. Mutual Benefit Life Ins. Co., 192 Colo. 377, 560 P.2d 824, 827 (1977); Golden Rule Ins. Co. v. Lease, 755 F.Supp. 948, 954 (D. Colo. 1991); see also, Spencer v. Kemper Investors Life Ins. Co., 764 P.2d 408, 412 (Colo.App. 1988).

I agree with the majority that Ms. Lips' failure to reveal she had been treated by Drs. Weller and Brightwell in responding to Question 7B and failure to mention the drugs Lasix and Elavil in responding to Question 7K would not constitute *per se* material misrepresentation. However, when coupled with the longstanding myriad of undisclosed physical ailments and complaints which had persisted to the time of the filing of the application, they, too, become material representations.

Ms. Lips' failure to disclose the medications of Lasix and Elavil, in light of her longstanding ailments, is not just coincidental. Lasix (furosemide), according to the current Physicians' Desk Reference is indicated in adults for treatment of edema (swelling) and when a greater diuretic effect is desired. Elavil is an antidepressant with sedative effects. These

5

medications, viewed in the context of Ms. Lips' longstanding symptoms and ailments, would also be material to the health insurance underwriter.

Further, I conclude as a matter of law that American Community relied on Ms. Lips' non-disclosures in issuing health insurance coverage to her. Ms. Lips' physical complaints brought on by the breast implants were not revealed on the application so, as the application states, benefits are not payable because the "sickness, injury, or condition is [not] fully and completely disclosed on the application . . . ." Underwriter Ms. Yemc sent Ms. Lips a letter explaining the reasons for the policy rescission as follows:

> "During routine claims handling records were obtained from Dr. Aschendrener [sic], Dr. Ford, Dr. O'Rourke, and Dr. Bland. Information in those records indicated that you had multiple symptoms and conditions which were not disclosed on the application. Dr. Aschendrener's [sic] records indicate that you have been diagnosed and treated for depression, had symptoms of arthralgias, myalgia, weakness, fatigue and a scleroderma like disease onset age 44, a heart murmur which you were told of on and off during the years, blurred vision, spastic colon, on [sic] 1987 a worsening of symptoms which included loss of word finding and long and short term memory, difficulties with gait and balance and continued depression. He [sic] also indicated you were seen by multiple physicians none of which were disclosed on your application." (Aplt's App. at 0058)

Ms. Yemc, in her affidavit, states the following:

> "8. Ms. Lips' failure to disclose the symptoms and conditions identified in the immediately preceding paragraph were material to American Community's issuance of the Policy. Had this information been disclosed on the Application, based upon the underwriting guidelines utilized by American Community, the Application for insurance submitted by Ms. Lips would have been denied.

6

9. American Community utilizes the Underwriting Manual published by Lincoln National Corporation as a guide in making underwriting decisions. Copies of relevant pages from that Underwriting Manual are attached hereto as Exhibit 5; they reflect that chronic fatigue syndrome and scleroderma of the type described in Ms. Lips' medical records both are conditions calling for 'decline' of medical insurance applications."(Aplt's. App. at 0054-0055)

The Lincoln National Corporation's underwriting manual provides:

"Scleroderma (generalized scleroderma, progressive systemic sclerosis, PSS) is characterized by diffuse fibrosis (scarring) of the skin (scleroderma) and multiple other organs or tissues including the joints, gastrointestinal tract, lungs, heart, and kidney. CREST syndrome is a variant of scleroderma consisting of calcinosis (deposition of calcium within the subcutaneous tissues), Raynaud's phenomenon, esophageal movement abnormalities, sclerodactyly (scleroderma affecting the fingers and toes), and telangiectasia of the skin. Both scleroderma and CREST syndrome have a poor prognosis."

( Aplt's App. at 0062). The underwriting manual also states that chronic fatigue syndrome requires rejection of an application for health insurance. ( Aplt's App. at 0060).

The majority is correct in finding that Mr. Miller's conclusions favorable to Ms. Lips lack a proper foundation as he was not privy to the medical information and relied only on her oral representations. Insurance agent Miller initially came to Ms. Lips' aid and asserted her general systemic maladies were related only to gynecological change of life. However, after Mr. Miller learned of Ms. Lips' longstanding history of arthralgias, myalgias, weakness and fatigue, depression, spastic colon/irritable bowel syndrome, mental difficulties, and difficulties with her gait and balance, Miller stated had he known of this information he

7

would not have submitted her health insurance application to American Community in the first place.

Mr. Miller had a conversation with Ms. Lips and advised that her longstanding history of serious physical problems might well assist her in her personal injury damage claim against the breast implant manufacturer (Dow), but was in direct conflict with and contrary to her negative responses on her health insurance application to American Community. His admonition to Ms. Lips was well-advised:

> "If the doctor's office submits the claims to the insurance company, the policy is less that [sic] two years old, the insurance company can investigate the claim because of the period of contestability. And if you now, through – via a doctor's record, indicate symptoms, problems, complaints, and the doctor indicates that it is correlating back to the implants, a medical condition, then, I said, you are in danger of losing your coverage. (Aplt's. App. at 00200)

> \*    \*    \*    \*

> So what I basically told her is, you can't have two truths. You can't have a truth over here and a truth over here and they're different. And without saying I think you're lying one way or another, 'cause I don't believe that, what I'm trying to say to you is, is don't do this with the insurance company, you know. You can't develop new history and accent all this stuff, and then say to the insurance company, look at it again and pay these bills. Because they're going to look at it and say, This looks terrible, and this has been around for years and years and years."
> (Aplt's App. at 00209)

In sum, as a matter of law, I conclude Ms. Lips' answers to Questions 7A, and to Questions 7B and 7K in light of her answer to 7A, constitute material mispresentations upon

which American Community relied to its detriment in issuing the health insurance policy to Ms. Lips, and accordingly would affirm the district court's grant of summary judgment to American Community on the breach of contract claim.

Given this conclusion, only a brief discussion is required of plaintiff's extra-contractual claims for willful and wanton breach of insurance contract, bad faith breach of insurance contract, breach of implied covenant of good faith and fair dealing, negligence, extreme and outrageous conduct, and intentional infliction of emotional distress (all of which allegedly support a claim for exemplary damages).

The case of <u>Travelers Ins. Co. v. Savio</u>, 706 P.2d 1258, 1274 (Colo. 1985), states that a claimant who asserts an insurer has failed to pay a claim in bad faith must establish the insurer acted unreasonably and with knowledge or reckless disregard of the fact that there is no reasonable basis to deny the claim. <u>See</u> <u>also</u>, <u>Cook v. Jackson National Life Insurance Co.</u>, 885 F.Supp. 221, 225 (D. Colo. 1995). As set out above, the uncontroverted facts support American Community's actions in denying coverage for Ms. Lips' breast removal surgery and the rescission of the subject health policy. Even if the majority were correct that legitimate factual issues exist for the trier of fact on plaintiff's breach of contract claims, plaintiff's extra-contractual claims sounding in tort as a matter of law cannot proceed because an insurance carrier has a right to litigate a legitimate coverage dispute without being subjected to willful, wanton bad faith claims.

For the same reasons expressed above, Ms. Lips' claims for outrageous conduct and

9

intentional infliction of emotional distress are groundless and the proper subject for summary judgment under Fed.R.Civ.P. 56. Churchey v. Adolph Coors Co., 759 P.2d 1336, 1350 (Colo. 1988). Ms. Lips' claim for punitive damages fails for the same reasons. Frick v. Abell, 198 Colo. 508, 602 P.2d 852, 854 (1979), and C.R.S. §§ 13-21-102(1)(a); 13-25-127(2).

In conclusion, the trial court was correct in sustaining American Community's motion for summary judgment under Fed.R.Civ.P. 56. Thomas v. International Business Machines, 48 F.3d 478, 484 (10th Cir. 1995) (quoting Matsushita Electric Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). The uncontroverted evidence establishes as a matter of law the claimant failed to disclose and misrepresented material facts in her health insurance application. American Community was legally justified in refusing medical benefits for the surgical removal of the breast implants and in rescinding the health insurance policy.