Stephen OLIVAREZ, Plaintiff,

v.

CENTURA HEALTH CORPORATION, a Colorado corporation and Centura Health Security Division, a division of Centura Health Corporation, Defendants.

No. Civ.A.00–S–158.

United States District Court, D. Colorado.

April 18, 2002.

Paul Anthony Baca, Denver, CO, Barry Douglas Roseman, Roseman & Kazmier-

ski, LLP, Denver, CO, for Stephen Oliva-rez, plaintiff.

Mark L. Sabey, Kutak Rock, LLP, Denver, CO, for Centura Health Corporation, Colorado corporation, defendant.

Mark L. Sabey, (see above), for Centura Health Security Division, a division of Centura Health Corporation, defendant.

### Memorandum Opinion and Order

SPARR, Senior District Judge.

THIS MATTER comes before the Court on the Defendants' Motion for Summary Judgment (filed June 22, 2000). The Court has reviewed the Motion, Plaintiff's Response, Defendants' Reply, the exhibits and affidavits, the entire case file and the applicable law and is sufficiently advised in the premises.

## I. FACTUAL BACKGROUND

Plaintiff Stephen Olivarez, a Hispanic/Native American, began working for Defendants on April 7, 1997. Defendants' Motion for Summary Judgment, App. B, p. 7 ¶ c–d [hereinafter "Mot."]. He was employed as a Security Officer and was assigned to work at the Gardens at St. Elizabeth, a residential care facility for the elderly within the Centura Health system. *Id.* On December 28, 1998, Plaintiff took a medical leave of absence under the Family and Medical Leave Act ("FMLA"). 29 U.S.C. § 2601, *et seq.* Plaintiff's Response, Ex. 1, p. 4 ¶ 2(f) [hereinafter "Resp."]. During his medical leave, Plaintiff prepared two letters documenting alleged incidents of racial discrimination that he experienced during the course of his employment with Defendants. Mot., Exs. 26, 27. The allegations in the letters set forth in the Complaint. Plaintiff addressed the letters to his immediate supervisor, Roger Rewerts, and delivered the letters to Mr. Rewerts on February 8, 1999. Resp., Ex. 1, pp. 4–5 ¶ 2(h). When Plaintiff delivered the letters, Mr. Rewerts

informed him that Beth Breen would be replacing Mr. Rewerts as the supervisor for Security Officers on the day shift and that Mary Kay Vezina would be replacing him as the supervisor for Security Officers on the night shift. Mot., Ex. 28, p. 1. The letters were forwarded to Alisa Rathbun, the Director of Human Resources for Centura Health, for investigation. Mot., App. C, p. ¶ 3.

On February 17, 1999, Plaintiff sent Ms. Rathbun a letter to clarify two of the allegations contained in the February 8 letters and to express his dissatisfaction with the supervisory change for Security Officers. Mot., Ex. 28. In his letter to Ms. Rathbun, Plaintiff also stated that he was "currently searching for other employment . . . because there is a possibility that my complaints and/or problems may not be resolved in an honorable, professional, and in an EEO manner." *Id.*, p. 2. Plaintiff later stated that he was not, in fact, seeking other employment at that time, but that he told Defendants that he was seeking other employment so that his complaints would be "taken seriously and dealt with in an honorable and professional manner conducive to equal employment opportunity." Resp., Ex. 1, p. 5 ¶ 2(i).

Plaintiff was still on medical leave when he met with Ms. Rathbun on March 10, 1999, to discuss the allegations contained in the February 8 letters. *Id.* During the meeting, Ms. Rathbun advised Plaintiff that she had investigated the allegations of discrimination and harassment that he made in his letters and that her investigation yielded no evidence of discrimination or harassment. Mot., App. C, pp. 20–21. Ms. Rathbun also confirmed that upon his return as a day shift Security Officer, he would be under the supervision of Beth Breen instead of Mr. Rewerts. *Id.*, App. C, p. 21.

On April 5, 1999, Plaintiff sent a letter to Ms. Rathbun thanking her for meeting with him, outlining his dissatisfaction with her investigation and recommendations, and informing her that he did not want to meet again to discuss his problems and issues because he would be meeting with his attorney. Mot., Ex. 30. Plaintiff stated that after the meeting with Ms. Rathbun, he privately concluded that his complaints would not be dealt with in a fair and impartial manner, so he began looking for other employment. Resp., Ex. 1, pp. 5–7 ¶ 2(i)–(j).

On April 15, 1999, Plaintiff met with Ms. Rathbun a second time to request an additional leave of absence because his leave under FMLA was about to expire. Mot., App. C, p. 3. Resp., Ex. 1, p. 7 ¶ 2(*l*). Plaintiff's request for an additional leave of absence was granted. Ms. Rathbun also gave Plaintiff a complete list of available Centura Health job openings because, due to his injury, Plaintiff would be unable to resume working as a Security Officer when his leave expired. Mot., Ex. 8 and App. B, pp. 7–8 ¶ 2(h). Resp., Ex. 1, pp. 7–8 ¶ 2(k)–(*l*).

Plaintiff requested a copy of the Leave of Absence form and was told that a copy would be mailed to him. Resp., Ex. 1, pp. 7–8 ¶ 2(*l*). On April 26, 1999, Ms. Rathbun received a note from Plaintiff again asking for a copy of the Leave of Absence form because he had not yet received it. Mot., App. C, p. 3. On April 27, 1999, Mr. Rewerts and Ms. Rathbun received Plaintiff's resignation letter. *Id.,* App. C, p. 4 and Exhibit 32.

On October 13, 1999, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC"), claiming that he had been discriminated against on the basis of race and that Defendants retaliated against him. Comp., p. 6 ¶ 16. After Plaintiff received his right-to-sue letter from the EEOC, he filed a Complaint in this court alleging that Defendants denied him his right to equal employment under 42 U.S.C. § 1981 and 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Comp., p. 7 ¶ 23–24. Specifically, Plaintiff alleges: (1) Defendants created a hostile work environment resulting in constructive discharge because Plaintiff was forced to resign from his employment with Defendants; and (2) Defendants retaliated against Plaintiff for writing the February 8 letters. *Id.,* p. 5 ¶ 13–15.

## II. TITLE VII STANDARD OF REVIEW

Plaintiff's claim is based on a theory of disparate treatment. A disparate treatment claim exists when an employer treats an individual less favorably than others because of his or her protected status. *Faulkner v. Super Valu Stores, Inc.,* 3 F.3d 1419, 1424 (10th Cir.1993).

The allocations of burdens and proof for a Title VII claim are set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) [hereinafter *McDonnell Douglas* ] and *Texas Dep't. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) [hereinafter *Burdine* ]. Hostile work environment claims are included in the group of viable claims of racial discrimination for which the evidentiary burden is the same for claims brought pursuant 42 U.S.C. § 1981 as it is for claims brought under Title VII. *McCowan v. All Star Maintenance, Inc.,* 273 F.3d 917, 921–22 (10th Cir.2001). *McDonnell Douglas* and *Burdine* set forth a three step process necessary to prove a Title VII discrimination claim.

The first step is for plaintiff to prove a *prima facie* case. "The burden of establishing a *prima facie* case of disparate treatment is not onerous." *Burdine,* 450 U.S. at 252, 101 S.Ct. 1089. After a *prima*

*facie* case has been established, the burden of production shifts to the defendant to rebut the presumption of unlawful discrimination by articulating a legitimate, nondiscriminatory reason for its action. The reason must be stated with sufficient clarity. *Burdine*, 450 U.S. at 255, 101 S.Ct. 1089.

> The defendant's burden is merely to articulate through some proof a facially nondiscriminatory reason for the termination; the defendant does not at this stage of the proceedings need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion.

*E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1316 (10th Cir.1992) (footnote omitted). "Under the *McDonnell Douglas* scheme, as properly applied, the level of proof necessary to rebut that presumption is small." *Id.* at 1318.

When defendant has rebutted plaintiff's evidence, the presumption of discrimination established by the *prima facie* showing "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993) [hereinafter *St. Mary's* ] (citation omitted). The burden then returns to plaintiff to prove that defendant's proffered reasons for the employment action were pretextual. "This burden merges with plaintiff's ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Rea v. Martin Marietta Corporation*, 29 F.3d 1450, 1455 (10th Cir.1994). There are two methods by which a plaintiff can demonstrate pretext. He may show that a discriminatory reason more likely motivated the employer or he can show that the employer's explanation is unworthy of belief. *Id.*

Plaintiff does not need to prove that the employer's proffered reasons are untrue

nor does he need to show that the unlawful motive was the sole motivating factor. *Id.* Nevertheless, "[i]n a disparate treatment case, liability depends on whether the protected trait ... actually motivated the employer's decision." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993). "[T]o withstand a motion for summary judgment once a *prima facie* case has been made, plaintiffs must still offer credible evidence that the real reason for the discharge was [discrimination based on the protected trait]." *Palochko v. Manville Corp.*, 21 F.3d 981, 982 (10th Cir.1994) (citation omitted). While the U.S. Supreme Court has rejected the premise that a plaintiff must always introduce additional independent evidence of discrimination to survive a motion for summary judgment, that presupposes that the defendant's justifications have been shown to contain implausibilities or inconsistencies, or is otherwise unworthy of credence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148–49, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Disbelief of the employer's reasons, along with the plaintiff's *prima facie* case can be sufficient to meet plaintiff's burden, but ultimately there must always be a finding of discrimination. *St. Mary's*, 113 S.Ct. at 2749.

## III. HOSTILE WORK ENVIRONMENT RESULTING IN CONSTRUCTIVE DISCHARGE

Plaintiff argues in his Complaint that a series of alleged discriminatory employment practices resulted in his constructive discharge. Comp., pp. 3–5 ¶ 10–12. However, in his Response, Plaintiff admits that only four of the series of alleged discriminatory practices listed in his Complaint could have been motivated by an unlawful discriminatory animus. Resp., pp. 13–14 ("While the defendants' assessment [that not all of Plaintiff's complaints include a

racial element] may be valid with regard to some of the actions complained of by plaintiff, there were several complained of actions which could reasonably inferred [sic] to be the product of unlawful racial or national origin bias."). Plaintiff further admits that those four events, even grouped together, may not have caused the alleged constructive discharge. *Id.*, p. 9. Rather, Plaintiff argues that the four events, coupled with (1) the manner in which his complaints were dealt with, (2) the change in supervision of the Security Officers, and (3) the failure of Defendants to send a copy of the Leave of Absence form, created a work environment that resulted in constructive discharge. *Id.*, pp. 9–10.

Defendants contend that Plaintiff cannot claim that he was constructively discharged because he was not subjected to a hostile work environment and because he was given reasonable options to continue his employment with Defendants. Mot., p. 12.

## A. Hostile Work Environment

"To survive summary judgment [on a hostile work environment claim], Plaintiff must show that 'under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privileges of employment, and (2) the harassment was racial or stemmed from racial animus.'" *Trujillo v. Univ. of Colorado Health Sciences Ctr.*, 157 F.3d 1211, 1214 (10th Cir.1998) [hereinafter *Trujillo* ] (quoting *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir.1994)); *Penry v. Federal Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998) ("For a hostile environment claim to survive a summary judgment motion, 'a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' ") [hereinafter *Penry* ] (quoting *Davis v. U.S. Postal Service*, 142 F.3d 1334, 1341 (10th Cir.1998)). "[A] few isolated incidents of racial enmity" or "sporadic racial slurs" is not enough to show pervasive harassment and "the mere utterance of a statement which engenders offensive feelings in an employee" is insufficient to show severe harassment. *Witt v. Roadway Express*, 136 F.3d 1424, 1432–33 (10th Cir.1998) [hereinafter *Witt* ].

Plaintiff contends that he was the victim of a hostile work environment because he was subjected to four alleged discriminatory employment practices. Resp., pp. 13–14. First, Plaintiff alleges that Mr. Rewerts threatened him with termination because he raised his voice to Bonnie Bronough, Mr. Rewerts's secretary, but that Ken Ackerman, a white Security Officer, was not threatened with termination when he left a loaded gun in a conference room. *Id.*, Ex. 1, pp. 17–19 ¶ 2(x). Second, Plaintiff alleges that his request for new uniform shirts was ignored but that Mr. Ackerman received new uniform shirts one day after his request. *Id.*, Ex. 1, p. 11 ¶ 2(n)–2(o). Third, Plaintiff alleges that Defendants falsely accused him of surveilling the whereabouts of co-employees. *Id.*, Ex. 1, p. 20 ¶ 2(z). Fourth, Plaintiff alleges that Defendants had a policy of prohibiting Spanish speaking employees from speaking Spanish in the presence of residents, while not prohibiting Serbian employees from speaking Serbian in front of residents. *Id.*, Ex. 1, pp. 22–23 ¶ 2(cc). However, Plaintiff further clarified his assessment of the alleged discriminatory employment practices by stating:

The plaintiff acknowledges the "pervasive" showing required under [*Trujillo* and *Witt* ] which might arguably bar a racially hostile environment claim re-

garding the first three actions set forth above under an argument that such actions were sporadic. However, the defendants' officials' action of banning the use of Spanish in the presence of residents is an action which had blanket, daily application. The plaintiff submits that the ban on speaking Spanish was an all-pervasive action which would meet the test under *Trujillo* or *Witt.*

Resp., p. 15.

The Court agrees that three events (the threat of termination, the request for new shirts and the accusation of surveillance) occurring over an undefined period of time are instances which, even if racially motivated, do not rise to the level of pervasive or severe harassment. *Trujillo,* 157 F.3d at 1214.

As to the policy regarding the speaking of Spanish, Defendants first argue that 29 C.F.R. § 1606.7(b) permits employers to "have a rule requiring that employees speak only in English at certain times where the employer can show that the rule is justified by business necessity." Mot., p. 17. Defendants contend that under that regulation, a policy that prohibits Spanish speaking in front of residents is lawful because it applied only to Carepartners (employees of Centura Health who provided care to residents) when in the presence of residents and because politeness to residents who do not understand Spanish is a valid business justification. *Id.* Defendants further argue that Plaintiff's allegation that a Spanish speaking policy existed must fail because it is based on hearsay. Reply, p. 3.

■ Plaintiff testified at his deposition that he found out about the Spanish speaking policy because Mary Maestas, Susanna Moreno and Elizabeth [1] told him that they had been asked to sign a note agreeing not to speak Spanish in front of residents. Mot., App.A, p. 67. Plaintiff further stated that "to the best of my knowledge their [sic] was no similar prohibition against [Serbian employees] speaking their native language as there was with Spanish-speaking employees." Resp., Ex. 1, p. 24 ¶ 2(cc). However, Plaintiff has not presented the Court with either affidavits of those who were affected by the policy or a copy of the note evincing the policy. Plaintiff's assertions about the existence of a note containing the alleged policy are based solely on hearsay and the Court cannot consider hearsay as evidence to defeat a motion for summary judgment.[2] *Thomas v. International Business Machines,* 48 F.3d 478, 485 (10th Cir.1995) [hereinafter Thomas] ("[H]earsay testimony that would be inadmissible at trial may not be included in an affidavit to defeat summary judgment.").

■ Additionally, even if such a policy existed, Plaintiff has not shown the Court that the policy was "sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Penry,* 155 F.3d at 1261. Furthermore, Plaintiff admits that he was not bound by the alleged policy because he was a Security Officer, not a Carepartner. Plaintiff argues that the policy affected him because "[o]ftentimes it was necessary that I communicate in Spanish to some of the employees whose English was extremely limited." Mot., Ex. 1, p. 23 ¶ 2(cc). However, Plaintiff does not elaborate on whether the employees with whom he had to communicate in

---

**1.** Plaintiff testified that he could not recall Elizabeth's last name.

**2.** If there was a policy that prohibited Spanish-speaking only, rather than requiring that

English be spoken, even if such a prohibition was applied only when Carepartners were in the presence of residents, the policy would not be in compliance with 29 C.F.R. § 1606.7(b).

Spanish were Carepartners and bound by the policy, whether the Spanish communications took place in front of residents, or how the Spanish communications with other employees resulted in a job detriment to him. Furthermore, Plaintiff is fluent in English and has not directed the Court to any evidence showing how a policy requiring that English be spoken in front of residents resulted in a job detriment to him. *Garcia v. Spun Steak Co.,* 998 F.2d 1480, 1488 (9th Cir.1993) ("a bilingual employee is not denied a privilege of employment by the English-only policy"); *Garcia v. Gloor,* 618 F.2d 264, 270 (5th Cir.1980) (holding that an English-only rule does not burden the terms and conditions of employment for those employees who are fluent in English); *Prado v. Luria & Son, Inc.,* 975 F.Supp. 1349 (S.D.Fla.1997); *Long v. First Union Corporation of Virginia,* 894 F.Supp. 933 (E.D.Va.1995).

In sum, Plaintiff has failed to show that he was subject to a hostile work environment.

## B. Constructive Discharge

■ An employee is constructively discharged when his working conditions are so intolerable that a reasonable person would feel compelled to resign. *Sanchez v. Denver Public Schools,* 164 F.3d 527, 534 (10th Cir.1998) ("Constructive discharge occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign.") [hereinafter Sanchez] (citation omitted). To establish that he was constructively discharged, a plaintiff must show that the employment conditions were "objectively intolerable," such that he "had no other choice but to quit." *Sanchez,* 164 F.3d at 534 (citation omitted).

Plaintiff argues that he was constructively discharged because of the factors which he alleged caused a hostile work environment, coupled with (1) the manner in which his complaints were dealt with, (2) the change in supervision of the Security Officers, and (3) the failure of Defendants to send a copy of his Leave of Absence form, created an objectively intolerable work environment that he had no other choice but to quit. Resp., pp. 9–10.

### 1. Defendants' Investigation of Plaintiff's Complaints

Plaintiff argues that his complaints were not dealt with in a fair and impartial manner, contributing to the intolerable work environment. As support for this argument, he contends that Defendants "failed to take appropriate remedial action" and that "Ms. Rathbun failed to interview all the employee's [sic] involved in [his] complaints as she initially represented to [him] that she did [and she] laid the blame for the plaintiff's problems squarely on his shoulders." Resp., pp. 10–11. Plaintiff's central contention as to why the investigation was unfair and partial appears to be his belief that Ms. Rathbun failed to interview all of the employees that had been involved in the incidents outlined in Plaintiff's February 8 letters. Resp., Ex. 1, p. 6 ¶ 2(j).[3]

■ The Court has reviewed the exhibits proffered as records kept by Ms. Rathbun in the course of investigating Plaintiff's complaint. Mot., App.C. The record shows that she met with Mr. Rewerts, Ms. Vezina and Ms. Breen, the managers named in Plaintiff's letters. *Id.,* App.C,

**3.** Neither Plaintiff's Response nor Plaintiffs Affidavit names those employees who he

claims were not interviewed by Ms. Rathbun.

pp. 5–7, pp. 14–15, pp. 16–17. She also met with Ken Ackerman and Carlos Atencio, employees named in Plaintiff's letters. *Id.*, App.C, pp. 12–13, pp. 18–19. She obtained written answers to interrogatories and copies of Pay Adjustment documents from Ms. Bronough, an employee named in Plaintiff's letters. *Id.*, App.C, pp. 8–11. She attempted three times to telephone Rosanne Lovato, Susanna Moreno and Sulema Flores, employees named in Plaintiffs letters, but received no return calls. *Id.*, App.C, p. 3. She searched the Centura Health system for 'Elizabeth Liz,' an employee named in Plaintiff's letters, but found no employee by that name. *Id.* She maintained records of her investigation in accordance with what she said was her standard practice. *Id.*, App.C, p. 1. Eventually, after reviewing pertinent documentation and interviewing Plaintiff, three managers and two employees, Ms. Rathbun reached the conclusion that there was no evidence of illegal discrimination or harassment. *Id.*, App.C, pp. 1–2. In sum, the record indicates that Ms. Rathbun completed an investigation of Plaintiff's complaints that was both thorough and fair.

### 2. Change in Supervision

■ An objectively intolerable work environment arises when an employer's *"illegal discriminatory acts* has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." *Sanchez*, 164 F.3d at 534 (emphasis added) (citation omitted). Plaintiff contends that the change in supervision of Security Officers contributed to the objectively intolerable work environment because Defendants knew that Plaintiff had conflicts with both

Ms. Vezina and Ms. Breen. Resp., pp. 9–10. Plaintiff contends that because his letters to Defendants "delineated the previous confrontational encounters which he had with Ms. Vezina and, in addition, recounted a complaint which he made to Mr. Rewerts concerning Ms. Breen basically charging Ms. Breen of [sic] being untruthful regarding her allegation [about] a Hispanic co-employee of Plaintiff," Defendants were going to put him into a "hornets' nest" when he returned to work under the supervision of Ms. Vezina and Ms. Breen.[4] Resp., pp. 11–12.

Plaintiff's conflict with Ms. Vezina had to do with the manner in which she had previously reprimanded him because he felt that she "deliberately attack[ed] my *integrity and person as a Security Officer."* Mot., Ex. 27, p. 1, ¶ 2 (emphasis added). Evidence of this single incident in which Ms. Vezina allegedly attacked Plaintiff's abilities as a Security Officer contains no evidence that she attacked him based on his race. Because Plaintiff has not directed the Court to any evidence showing that Ms. Vezina harbored a racial animus toward Plaintiff or any other Security Officer, Plaintiff cannot claim that supervision of Security Officers by Ms. Vezina would create an intolerable work environment.

Plaintiff's opposition to Ms. Breen acting as manager of Security Officers relates to the manner in which she allegedly dealt with Carlos Atencio, a Hispanic Security Officer. Resp., Ex. 1, p. 12 ¶ 2(s). Plaintiff alleges in his February 8 letters that at a November 3, 1998, meeting with Security Officers, Ms. Breen "stated that employees' lives were being placed at risk when

---

4. Plaintiff's February 17 letter to Ms. Rathbun expressed his opposition to supervision of Security Officers by Ms. Vezina and Ms. Breen because neither was a manager in the Security Division of Centura Health. Plaintiff stated

that "[i]n a security department, security, including security officers, should not be answerable to anyone but the security manager who then answers to the next authority up the chain." Mot., Ex. 27, p. 2.

Security did not escort employees who need an escort." Mot., Ex. 27, p. 4. Plaintiff further alleges that this statement was directed toward Mr. Atencio, because Mr. Atencio told Plaintiff that earlier that day he had been called to escort an employee. *Id.*

Plaintiff's claim that Ms. Breen's statement was directed toward Mr. Atencio is, at best, based on hearsay, which, as the Court previously noted, cannot be considered in opposition to a motion for summary judgment. *Thomas,* 48 F.3d at 485. However, even assuming that the statement made by Ms. Breen was directed toward Mr. Atencio, this general statement is not evidence of either racially motivated discrimination or harassment. The statement is, on its face, non-discriminatory. The statement was made to all Security Officers at the meeting. Both white and Hispanic Officers were present. Mot., Ex. 27, p. 1. Furthermore, Plaintiff has admitted that "[w]ith regard to Ms. Breen, I never had any direct problems with her and I admit that she never projected any bias against me as a person of Hispanic descent that I can recall." Resp., Ex. 1, p. 12 ¶ 2(s). Because Plaintiff has not produced any evidence showing that Ms. Breen harbored a racial animus toward Plaintiff or anyone else, Plaintiff cannot realistically claim that supervision of Security Officers by Ms. Breen would create an intolerable work environment.

### 3. Failure to Send Leave of Absence Form

■ Plaintiff alleges that Defendants' failure to send him the Leave of Absence form was the "straw that broke the camel's back" in creating the intolerable work environment. Resp., pp. 7–8 ¶ 2(I). However, nowhere does Plaintiff allege that Defendants' failure to send the form was racially motivated. In fact, Ms. Rathbun noted that when she received a written request from Plaintiff asking for the form,

she called him to explain that the form had not been sent because Mr. Rewerts had been out of town and was not available to sign it. Mot., App.C, pp. 3–4. In the absence of any evidence that this incident was racially motivated, it also fails to show that Plaintiff's employment conditions were objectively intolerable.

## IV. CLAIM FOR RETALIATION

■ Pursuant to 42 U.S.C. § 2000e–3(a), it is unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice" under Title VII. To establish a *prima facie* case of retaliation, a plaintiff must prove that "(1) he engaged in protected opposition to discrimination; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action." *O'Neal v. Ferguson Construction Co.,* 237 F.3d 1248, 1252 (10th Cir.2001). Plaintiff relied on constructive discharge as the adverse employment action at issue. Consequently, because Plaintiff failed to establish that he was constructively discharged, he cannot establish that he suffered an adverse employment action. Therefore, his claim for retaliation must fail.

## V. CONCLUSION

The Court has found that Plaintiff failed to show pervasive or severe racial harassment; therefore, summary judgment must be granted on his hostile work environment claim. Similarly, the Court has found that none of the factors upon which Plaintiff relied to support his constructive discharge claim have any validity as either racially motivated incidents or events which made his employment conditions objectively intolerable. Consequently, summary judgment must be granted on his

constructive discharge claim. Finally, because the Court has found that Plaintiff was not a victim of adverse employment action, his claim for retaliation must also fail.

It is, therefore ORDERED that Defendants' Motion for Summary Judgment is granted. Judgment shall be granted in favor of Defendants and against Plaintiff for all claims in Plaintiff's Complaint. Each party shall pay its own costs and fees.