Darlene THOMAS, Plaintiff–Appellant,

v.

INTERNATIONAL BUSINESS MACHINES, a New York corporation doing business in the State of Oklahoma, Defendant–Appellee.

No. 93–6062.

United States Court of Appeals, Tenth Circuit.

Feb. 21, 1995.

480

Lewis Barber, Jr. and Guinise M. Marshall of Barber & Marshall, P.A., Oklahoma City, OK, for plaintiff-appellant.

Jeffrey G. Huvelle and Thomasenia P. Duncan of Covington & Burling, Washington, DC, and Mona S. Lambird and Carolyn Gregg Hill of Andrews Davis Legg Bixler Milsten & Price, Oklahoma City, OK, and Douglas G. Vetter of IBM Corp., Somers, NY, for defendant-appellee.

Before MOORE and EBEL, Circuit Judges, and VRATIL, District Judge.*

* The Honorable Kathryn H. Vratil, United States District Court Judge, District of Kansas, sitting by designation.

EBEL, Circuit Judge.

Plaintiff–Appellant Darlene Thomas ("Thomas"), an employee of Defendant–Appellee International Business Machines Corporation ("IBM"), appeals the district court's summary judgment dismissal of her claim that IBM violated the Age Discrimination in Employment Act ("ADEA"), codified as amended at 29 U.S.C. §§ 621–634. Thomas also appeals the court's grant of IBM's motion for a protective order to relieve John F. Akers, Chairman of the Board of Directors of IBM, from the necessity of complying with Thomas' notice to take deposition. We affirm.[1]

## I. Background

Since 1979, Thomas has performed clerical and administrative duties in IBM's Oklahoma City office. In early 1990, IBM merged the Oklahoma City National Service Division, where Thomas had worked under the supervision of Dorothy Warren ("Warren"), into the Marketing Branch. In the Marketing Branch, Thomas' new direct supervisor was Mark Beck ("Beck"), who in turn reported to Dan Aleto ("Aleto"), the branch operations manager.

Before Thomas was hired, IBM implemented an employee performance rating system pursuant to which each employee received an annual written evaluation that included a performance score between 1 and 5. An employee who "far exceeds" expectations receives a "1," whereas a "5" reflects unsatisfactory performance, and a "4" means that the employee has met his or her requirements, and no more. During her thirteen-year tenure with IBM, Thomas has never received an annual performance rating of "1" or "2," but also never received a "5."

In May 1991, Aleto ranked the thirty-three administrative employees in the Marketing Branch according to their "relative contribution to IBM's business." A critical component of Aleto's evaluation was each employee's most recent performance rating. IBM admonished employees that if they received a performance rating of "4" and a low rank vis-

a-vis their colleagues, their positions would be at risk. A 1991 company memo entitled "Determining Employee Contribution in IBM" informed employees that the ranking was precipitated by IBM's aim to enhance its performance in what had become a keenly competitive computer market. In his evaluation of Thomas' department, Aleto ranked Thomas thirtieth out of thirty-three, which placed her in the bottom quartile. Among all the employees included in this May 1991 ranking of her department, only Thomas and two others had never received a ranking of "1" or "2."

Just two months later in July 1991, Beck completed his annual review of Thomas and evaluated her performance at level "4." In April 1992, Thomas again received a "4" rating in her annual review. This time Warren, who had replaced Beck as Thomas' supervisor, conducted the evaluation.

Also during the early 1990s, IBM instituted a voluntary separation incentive program known as Individual Transition Options ("ITO"). Pursuant to ITO, IBM offered employees the opportunity to retire and receive a severance payment based on their length of service and salary level. Alternatively, the program allowed employees not yet eligible for retirement to take an unpaid leave of absence for up to eight years, during which time they would accrue service credits toward retirement and enjoy coverage under IBM's medical plan. IBM offered ITO to all employees, regardless of age.

Between June 1991 and May 1992, Thomas' supervisors periodically encouraged her to pursue the ITO program because IBM was contemplating a reduction in the number of administrative employees in its Oklahoma City office. Although Thomas knew that her undistinguished performance evaluations and ranking placed her job at risk, she nonetheless opted to remain at IBM and is today one of thirteen administrative employees in the Oklahoma City office.

On May 12, 1992, Thomas commenced this action, alleging the following federal and

1. After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. See Fed.R.App.P. 34(f); 10th Cir.R. 34.1.9. The case is therefore ordered submitted without oral argument.

state law claims: (1) IBM violated the ADEA by giving her undeservedly low performance evaluations in order to coerce her to resign under the ITO program; (2) IBM engaged in intentional infliction of emotional distress; and (3) IBM committed fraud and deceit in its evaluations of her performance.

After the parties conducted written discovery and exchanged witness and exhibit lists, they filed myriad pretrial motions between November 1992 and January 1993. The two critical motions for this appeal are IBM's motion on December 4, 1992 for a protective order to relieve IBM Chairman Akers from complying with Thomas' notice to take his deposition and IBM's December 14, 1992 motion for summary judgment. On December 8, 1992, the court granted IBM's motion for a protective order to block the Akers deposition and subsequently denied Thomas' two motions for reconsideration. After ruling on numerous additional motions to compel and extend discovery, the court granted summary judgment in favor of IBM on all claims on January 20, 1993.

In this appeal, Thomas contends that the court abused its discretion in preventing the Akers deposition and that genuine issues of material fact preclude summary judgment in favor of IBM on the ADEA claim.[2]

## II. Discussion

### A. The Protective Order to Block the Akers Deposition

■■■ Because the decision to grant a protective order under Fed.R.Civ.P. 26(c) is vested in the district court's discretion, we will only reverse the court's ruling if that discretion was abused.[3] *Wang v. Hsu,* 919

F.2d 130, 130 (10th Cir.1990). Under the abuse of discretion standard, we will not disturb a trial court's decision absent "a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *United States v. Ortiz,* 804 F.2d 1161, 1164 n. 2 (10th Cir.1986).

To place the district court's grant of IBM's protective order in proper perspective, we briefly review what transpired prior to its ruling. Thomas filed her complaint on May 12, 1992 and IBM filed its answer on June 4, 1992. In a pretrial conference in early July, the court scheduled discovery to end on December 1, 1992 and set trial for January 1993. On November 16, 1992, IBM and Thomas filed a joint application to extend the discovery deadline and the trial date. On November 17, 1992, the court denied this application. On November 24, 1992, the court granted IBM's counsel's request to withdraw from the case. The next day, new IBM counsel entered an appearance and requested both a ten-day extension in the discovery deadline and permission to file a summary judgment motion on December 17, 1992; counsel did not request an extension in the trial date. On November 30, 1992, the court granted this discovery extension, but required all summary judgment motions to be filed on December 14, 1992. On December 1, 1992, Thomas also requested a ten-day discovery extension, which the court granted that same day.[4] Also on December 1st, Thomas gave notice in violation of Local Rule 15(A) to depose Akers in Oklahoma City on December 7th, fewer than five business days later. IBM responded on December 4th with

---

**2.** Because Thomas does not appeal the court's summary judgment dismissal of her claims of intentional infliction of emotional distress and fraud, we do not address these issues. *Abercrombie v. City of Catoosa,* 896 F.2d 1228, 1231 (10th Cir.1990) (failure to argue an issue in the appellate brief or at oral argument constitutes waiver, even when the appellant lists the issue in the notice of appeal).

**3.** Fed.R.Civ.P. 26(c) provides in pertinent part:

Upon motion by a party or by the person from whom discovery is sought, accompanied by a certification that the movant has in good faith conferred or attempted to confer with

other affected parties in an effort to resolve the dispute without court action, and for good cause shown, the court in which the action is pending or alternatively, on matters relating to a deposition, the court in the district where the deposition is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense....

**4.** Given that the court granted Thomas the same discovery extension afforded to IBM, Thomas' claim that the court abused its discretion in granting IBM a unilateral discovery extension is without merit.

its motion for a protective order. On December 4th, Thomas served IBM with a second deposition notice and also requested the court to waive the five-day notice requirement in Local Rule 15(A). On December 8th, the court granted IBM's motion for a protective order.

■ We conclude that the record amply supports the court's protective order. First, Thomas does not dispute that her notice to depose Akers in Oklahoma City on December 7th violated the court's Local Rule 15(A), which requires opposing counsel to give five-days notice to deponents who are outside the jurisdiction. Additionally, Thomas' notice to conduct the deposition in Oklahoma City clashes with the normal procedure that the "deposition of a corporation by its agents and officers should ordinarily be taken at its principal place of business." 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure: Civil § 2112 at 81 (1994) (citations omitted).

Thomas attempts to justify her deposition request by arguing that the lack of adequate notice arose from the court's expedited discovery schedule and that Akers would not be inconvenienced by traveling to IBM's Oklahoma City office. However, noticeably absent from Thomas' opposition to IBM's protective order motion is any explanation as to why she waited until December 1st to set the deposition date and why her counsel could not have conducted the deposition at IBM's principal place of business in White Plains, New York. Indeed, the district court noted that Thomas not only waited until after the expiration of the original discovery deadline to give notice of Akers' deposition, but also had not taken the deposition of any other IBM personnel.

Furthermore, IBM submitted an affidavit from Akers in which he testified that he lacked personal knowledge of Thomas and was unaware of her age, her performance ranking, any work evaluations that she might have received, or that she even worked for IBM.[5] See Lewelling v. Farmers Ins. of

Columbus, Inc., 879 F.2d 212, 218 (6th Cir. 1989) (upholding district court's exercise of discretion in granting protective order to bar plaintiffs from deposing their employer's chief executive officer, who lacked knowledge about any pertinent facts); Salter v. Upjohn Co., 593 F.2d 649, 651 (5th Cir.1979) (upholding protective order in a wrongful death action against a drug manufacturer that barred the deposition of the defendant's president because he was extremely busy and lacked direct knowledge of facts in dispute, and other employees had more direct knowledge). Nothing in the record indicates that IBM did not make available for deposition Thomas' direct supervisors, who conducted the performance evaluations and ranking. Also, Akers explained that the deposition would have imposed "severe hardship" because he was required to attend previously scheduled meetings with IBM senior management in New York from December 3, 1992 to December 14th.

Thomas argues that Akers' deposition was critical for her case because he had allegedly authored an IBM policy designed to discriminate against older employees. Thomas notes that Akers testified in Rathemacher v. IBM, No. 88–3463, 1992 WL 41719 (D.N.J. Feb. 28, 1992), in which a former IBM manager prevailed on a constructive discharge claim that the company forced him to accept an early retirement plan by demoting him from management, transferring him, and harassing him in the workplace.[6]

Although it is conceivable that Akers' testimony about the genesis of the ITO program could be relevant to a disparate impact claim against IBM, the district court concluded that Thomas did not allege disparate impact in her complaint, in the parties' Joint Status Report, or in her Final Contentions filed on November 2, 1992. Moreover, Thomas made no attempt to demonstrate that the information she seeks to obtain from Akers could not be gathered from other IBM personnel, for whom a deposition might have been less burdensome.

---

5. In a corroborating affidavit, Aleto testified that he never informed Akers about Thomas' evaluation and ranking.

6. Thomas submitted a transcript of Akers' testimony in Rathemacher in opposition to IBM's summary judgment motion in the instant case.

When we add to these factors Thomas' failure to give Akers adequate notice, the burden that a hurried deposition would have imposed on Akers, the fact that Thomas waited until the eleventh hour to request the deposition, and her failure to depose any other IBM personnel, including her own direct supervisors, it was clear beyond peradventure that the district court did not abuse its discretion in issuing the protective order.

## B. The ADEA Claim

■ We review de novo the district court's summary judgment ruling in favor of IBM on Thomas' ADEA claim and apply the same standard used by the district court. *Applied Genetics Int'l. Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as matter of law." Fed.R.Civ.P. 56(c). We examine the factual record and reasonable inferences therefrom in the light most favorable to Thomas, who opposed summary judgment. *Applied Genetics*, 912 F.2d at 1241.

■ IBM, as the moving party, has the initial burden to show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once IBM meets this burden, the burden shifts to Thomas to identify specific facts that show the existence of a genuine issue of material fact. "The party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," summary judgment in favor of the moving party is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The ADEA makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" or to "classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee," because of the individual's age. 29 U.S.C. § 623(a)(1)–(2).

■ To prevail on a disparate treatment claim, Thomas "must prove by a preponderance of the evidence that IBM had a discriminatory motive or intent." *Ortega v. Safeway Stores, Inc.*, 943 F.2d 1230, 1236 (10th Cir. 1991). Absent direct proof of discriminatory intent, we evaluate Thomas' claim under the burden-shifting analytical framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). "The framework for assessing the evidence in an age discrimination case parallels that applicable in a Title VII case." *Spulak v. K Mart Corp.*, 894 F.2d 1150, 1153 (10th Cir. 1990).

■ A typical claim of age discrimination against an employer arises when the employer discharges an employee on the basis of age, in which case the employee establishes a prima facie case by showing that (1) the employee belongs to the protected age group; (2) the employee's job performance was satisfactory; (3) the employee was discharged; and (4) the employee was replaced by a younger person. *MacDonald v. Eastern Wyo. Mental Health Ctr.*, 941 F.2d 1115, 1119 (10th Cir.1991).

■ Here, the gravamen of Thomas' ADEA claim is not that she was discharged, but rather that IBM unsuccessfully sought to induce her to accept the ITO program and discriminated against her by giving her undeservedly low performance evaluations, to wit: the July 1991 and April 1992 performance ratings of "4" and the May 1991 ranking, which placed her in the bottom quartile.[7]

---

7. In her complaint, Thomas requested the following relief: an injunction barring IBM from "reprisal and further acts of discrimination"; expungement of unsatisfactory performance rat-

Thus, we modify the third prong to require proof that adverse employment action was taken against her. Similarly, we modify the fourth element to require proof that comparable employees who were not in a protected age category did not receive comparable adverse employment action. Alternatively, Thomas could present direct proof of intent to discriminate against her based on her age.

Thomas has satisfied the first prong of the prima facie case because she was over 40 years of age when the alleged discrimination occurred. She arguably meets the third prong insofar as IBM gave her two undistinguished annual reviews and a poor departmental ranking. To support the second and fourth prongs of her prima facie case, Thomas relies on her own five-page affidavit, the affidavit of Professor Phil McCormack, an expert witness, and Akers' testimony in *Rathemacher*. She advances no direct evidence showing that IBM intended to discriminate against her based on her age.

Before exploring Thomas' proffered evidence, we address IBM's claim that Thomas' affidavit contains inadmissible hearsay that may not be used to defeat summary judgment. At the summary judgment stage, affidavits must "set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R.Civ.P. 56(e); *Committee for the First Amendment v. Campbell*, 962 F.2d 1517, 1526 n. 11 (10th Cir.1992) ("In opposing a motion for summary judgment, the nonmovant must make a showing that, '*if reduced to admissible evidence*,' would be sufficient to carry the nonmovant's burden of proof at trial.") (*quoting Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555) (emphasis added).

 To be sure, the nonmoving party need not produce evidence "in a *form* that would be admissible at trial," *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553, but the content or substance of the evidence must be admissible. *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267–68 (7th Cir.1994). For example, hearsay testimony that would be inadmissible at trial may not be included in an affidavit to defeat summary judgment because "[a] third party's description of [a witness'] supposed testimony is not suitable grist for the summary judgment mill." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990). Furthermore, "generalized, unsubstantiated, non-personal affidavits are insufficient to successfully oppose a motion for summary judgment." *Stevens v. Barnard*, 512 F.2d 876, 879 (10th Cir.1975).

 The purported hearsay that IBM and the district court identifies in Thomas' affidavit is her statement that colleagues under the age of 40 received transfer opportunities from IBM, whereas colleagues over 40 years of age who ranked in the third and fourth quartile of the May 1991 ranking did not receive transfer offers. From the record before us, however, we cannot determine whether this statement is necessarily hearsay. If Thomas is testifying to what an authorized agent for IBM told her, the statements would constitute an admission by a party-opponent and therefore be admissible under Fed.R.Evid. 801(d)(2). However, if Thomas is testifying to what other employees told her about what IBM agents in turn told them, then the testimony could constitute inadmissible hearsay. Because we must examine the record in the light most favorable to Thomas, we assume for purposes of this appeal that this statement is not hearsay.

Nevertheless, Thomas' affidavit merely contains conclusory allegations without specific supporting facts and thus lacks probative value. *Nichols v. Hurley*, 921 F.2d 1101, 1113 (10th Cir.1990). Perhaps most revealing is the absence of any proof by Thomas that her direct supervisors deflated her July 1991 and April 1992 performance evaluations, or her status in the May 1991 ranking, on the basis of her age. To the contrary, Thomas testified during a deposition that neither Beck, Warren, nor Aleto—the individuals who conducted the evaluations and ranking—treated her unfairly because of her age.

Further, Thomas acknowledged that she agreed with Beck's 1991 evaluation of her performance in at least two of the categories. In fact, Thomas failed to identify any em-

ings; nominal, compensatory, and liquidated

damages; and attorney's fees. Aplt.App. at 5–6.

ployee above whom she should have been ranked. Thomas' claims in her affidavit that her supervisor told her in January 1991 that she was performing at level "2," although in her July 1991 annual review she received a "4" rating. However, she does not show that this "4" rating was undeserved, nor does she show, or even allege, that the supervisor acted with discriminatory animus or intent.

The empirical data on which Thomas relies likewise offers no support for her prima facie case. Thomas testified that all employees ranked in the third and fourth quartile in the May 1991 ranking either belonged to a protected group under Title VII or the ADEA, had suffered from extensive illness, or had previously filed an EEOC complaint. However, she has grouped so many classifications of employees together that this statistic offers no proof of age discrimination. In fact, this data undermines her age discrimination argument because the distribution in all four quartiles according to age is evenly balanced.[8] In fact, five of the nine employees in the fourth quartile, and five of the six lowest ranked employees, were under 40 years of age. Additionally, Thomas offers no evidence that any employee in the third and fourth quartile should have received a higher ranking and she conceded that Aleto, who conducted the ranking, did not treat her unfairly on the basis of her age.

The two-page affidavit of Thomas' expert witness is similarly inadequate. Just three weeks prior to the submission of his affidavit, McCormack testified that "the evidence is lacking as far as showing whether or not the evaluation as received by Ms. Thomas was merited or not merited." Aplt.App. at 232. McCormack's affidavit neither amended nor retracted this deposition testimony. Instead, McCormack's affidavit is silent about Thomas' 1991 and 1992 performance evaluations or the May 1991 departmental ranking—the critical events in this ADEA claim. In fact, McCormack testified that IBM's appraisal system contained safeguards to minimize the possibility for unlawful bias or discrimination, such as a written performance plan, objective criteria, a requirement that the supervisor specify in writing the reasons for each rating, and an independent review of the supervisor's evaluation by the second-level manager.

McCormack's affidavit did state that, on the basis of interviews with "approximately 11 past and present employees of IBM," he believed that "Thomas was subjected to discrimination based on her age ... as a result of said ITO plan." Aplt.App. at 331. Aside from the minimal sample size of his study, McCormack failed to support this conclusory allegation with any specific facts or empirical evidence other than the generalized statement that "some employees under 40 were offered transfer options that were not offered to the majority of employees over 40." *Id.* Likewise, Akers' testimony in *Rathemacher*, a case involving constructive discharge, does not speak to Thomas' performance evaluations, ranking, or the ITO program.

■ Next, Thomas states in her affidavit that IBM conducted the May 1991 ranking before informing her of its intent to implement a ranking system and that her July 1991 performance evaluation was eight months late. However, Thomas fails to show a nexus between these two acts and her age discrimination claim—i.e. she demonstrated no plausible evidence of an unlawful discriminatory motive on IBM's part to rank Thomas before informing her of the system or to delay the performance evaluation. At summary judgment, the inquiry is not whether the parties dispute certain facts, but instead whether the evidence establishes a *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is "material" only if it "might affect the outcome of the suit under the governing law," and a dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

8. *The distribution is as follows:*

| Quartile | Employees Under 40 | Employees Over 40 |
|---|---|---|
| First | 5 | 3 |
| Second | 5 | 3 |
| Third | 4 | 4 |
| Fourth | 5 | 4 |

Aplt.App. at 96.

Finally, we reject Thomas' protestation that the district court's pretrial denial of IBM's motion in limine to exclude the testimony of four witnesses is irreconcilable with the court's subsequent summary judgment ruling. In denying IBM's motion in limine, the court correctly relied on *Spulak,* 894 F.2d at 1156, for the proposition that the testimony of other employees about their treatment by the defendant may, under some circumstances, be relevant to the issue of the employer's discriminatory intent. Because Thomas' proposed witnesses were either present or former IBM employees who allegedly experienced age discrimination, the court reasoned that their testimony at trial could be relevant. However, insofar as Thomas did not attempt to defeat IBM's summary judgment motion by proffering affidavits or depositions from these witnesses, the court properly gave no weight to Thomas' summary prediction of these witnesses' expected trial testimony.

Because Thomas has not provided any facts from which we can infer that IBM's performance evaluations and ranking were driven by age discrimination, we conclude that "the record taken as a whole could not lead a rational trier of fact to find for" Thomas on her disparate treatment ADEA claim. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356.[9]

### III. Conclusion

The district court's protective order and summary judgment order are AFFIRMED.

---

9. Although Thomas made a belated attempt to argue to the district court that she was also asserting a disparate impact claim, we agree with the district court that Thomas' complaint does not state a disparate impact claim. In her complaint filed on May 12, 1992, Thomas confined her ADEA claim to a disparate treatment theory, namely, that IBM unjustifiably deflated her performance evaluation and ranking because of her age. As the district court noted in its December 29, 1992 order, Thomas did not allege a disparate impact theory in her initial complaint, the parties' Joint Status Report, or her Final Contentions filed on November 2, 1992. Although Thomas made some attempt to assert a disparate treatment claim in the weeks before trial, the district court quite properly declined to allow Thomas to switch her theories at that late date. In any event, the statistics presented would not support a genuine dispute of material fact as to a disparate impact claim even if one were asserted.