**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 9, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

TYLER D. MALINSKI,

     Plaintiff Counter Defendant - Appellant,

and

PAULA SMITH,

     Intervenor Plaintiff - Appellant,

v.

BNSF RAILWAY COMPANY,

     Defendant Counterclaimant - Appellee.

No. 19-5001
(D.C. No. 4:15-CV-00502-JED-FHM)
(N.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MATHESON**, **PHILLIPS**, and **MORITZ**, Circuit Judges.
_____

Tyler Malinski and Paula Smith appeal the district court's order granting

summary judgment to BNSF Railway Company (BNSF). For the reasons explained

below, we affirm.

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. But it may be cited for its persuasive value. *See* Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

**Background**

On December 4, 2014,[1] a train owned and operated by BNSF struck Malinski's pickup truck as he drove through a railroad grade crossing near Afton, Oklahoma. The crossing is passive: signs mark the crossing, but there is no physical barrier to prevent a vehicle from driving across. It is undisputed that the train was traveling at 55 miles per hour at the time of the accident and that it sounded its horn for approximately 15 seconds prior to the accident. A video captured by a recording device on the locomotive at the front of the train shows that as the train approached the crossing, a pickup truck driven by Malinski's cousin crossed the tracks in front of Malinski. Malinski, who was headed to the same destination as his cousin, followed him through the crossing without stopping. As Malinski did so, the train struck his truck. The collision injured Malinski and his passenger, Nathan Smith, who later died from his injuries.

Malinski sued BNSF,[2] claiming that it acted negligently in maintaining the crossing and that this negligence proximately caused Malinski's injuries. BNSF twice moved for summary judgment, arguing in part that Malinski was negligent per se because (1) he violated Okla. Stat. tit. 47 § 11-701(A)(3) by failing to stop at the crossing after the train emitted a signal audible from approximately 1500 feet away

---

[1] Although parts of the record indicate that the accident occurred on December 5, 2014, the district court order stated it occurred on December 4, 2014, and on appeal the parties do not dispute this latter date.

[2] Paula Smith, Nathan Smith's mother, later intervened; she and Malinski submitted joint briefing on appeal. Throughout this opinion, we refer to Paula Smith as "Smith" and use Nathan Smith's full name where necessary.

2

from the crossing and (2) this statutory violation caused the collision. In support of its second motion for summary judgment, BNSF provided evidence of the horn test that it conducted ten days after the collision. The testing demonstrated that when measured 100 feet in front of the locomotive, the horn's volume was 100.5 decibels. BNSF also noted that its signal was compliant with the decibel range required by the Federal Railroad Administration's (FRA) regulations for locomotive horns and argued that the regulations were developed to ensure the horn's audibility within a quarter-mile, or 1320-foot, range. BNSF also provided testimony from a local resident who can hear the train's horn from his home, which is located more than 1500 feet from the crossing.

The district court granted BNSF's second motion for summary judgment.[3] It found that BNSF's horn test, the rationale for the FRA's horn regulations, and the local resident's testimony all demonstrated that the signal was audible from approximately 1500 feet away from the crossing. Based on this audibility finding, the district court concluded that Malinski violated § 11-701(A)(3). The district court then ruled that Malinski's statutory violation proximately caused the collision. Accordingly, it determined that Malinski was negligent per se and granted summary judgment to BNSF. Malinski and Smith now appeal.

---

[3] In its first motion for summary judgment, BNSF neither explained the significance of the horn testing nor included the local resident's testimony. The district court denied the motion, concluding that "[w]hile BNSF may, at most, have demonstrated that the train emitted an audible signal from one-hundred feet away, there is no evidence to show that the signal was audible from approximately 1,500 feet away, as required by the statute." App. vol. 1, 234.

**Analysis**

We review de novo a ruling on summary judgment, "applying the same standard as the district court." *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1180 (10th Cir. 2018). Summary judgment is appropriate if "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013) (quoting *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000)).

Here, BNSF is the movant and thus bears the "initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact." *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016) (quoting *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007)). If BNSF meets this initial burden, the burden then shifts to nonmovants Malinski and Smith to "set forth specific facts from which a rational trier of fact could find for" them. *Id.* (quoting *Libertarian Party of N.M.*, 506 F.3d at 1309). In evaluating the record, we make all "reasonable inferences . . . in the light most favorable to" nonmovants Malinski and Smith. *Thomas v. IBM*, 48 F.3d 478, 484 (10th Cir. 1995).

The district court granted BNSF's second motion for summary judgment because it found Malinski negligent per se. Under Oklahoma law, a statutory violation amounts to negligence per se when "(1) the violation of a statute . . . caused

4

the injury, (2) the harm sustained [is] of the type intended to be prevented by the statute[,] and (3) 'the injured party [is] one of the class intended to be protected by the statute.'" *Nye v. BNSF Ry. Co.*, 428 P.3d 863, 873 (Okla. 2018) (quoting *Ohio Cas. Ins. Co. v. Todd*, 813 P.2d 508, 510 (Okla. 1991)), *cert denied*, 139 S. Ct. 1600 (2019). Because the parties do not dispute that the second and third elements are satisfied here, this case turns solely on the first element. The district court found this first element satisfied, ruling both that Malinski violated the statute and that the violation caused Malinski's injuries and Nathan Smith's death. Malinski and Smith challenge both rulings on appeal.

Thus, applying the summary-judgment standard and the negligence-per-se test, we must determine if BNSF "ma[de] a prima facie demonstration of the absence of a genuine" factual dispute regarding (1) whether Malinski violated the statute and, if he did, (2) whether that statutory violation caused Malinski's injuries and Nathan Smith's death. *Savant Homes, Inc.*, 809 F.3d at 1137 (quoting *Libertarian Party of N.M.*, 506 F.3d at 1309); *see also Nye*, 428 P.3d at 873. If we find that BNSF has made such a demonstration, we must then determine whether Malinski and Smith "set forth specific facts from which a rational trier of fact could find" either that Malinski did not violate the statute or that the violation did not cause Malinski's injuries and

5

Nathan Smith's death. *Id.* at 1137 (quoting *Libertarian Party of N.M.*, 506 F.3d at 1309).

## I.    Statutory Violation

We first consider whether the evidence BNSF presented makes a prima facie demonstration that Malinski violated § 11-701(A)(3) and, if so, whether Malinski and Smith set forth sufficient evidence to place that demonstration in dispute. Section 11-701(A)(3) requires a driver at a "railroad grade crossing" to stop in the presence of certain visual or auditory signals indicating that a train is crossing or approaching.[4] When considering whether such a signal is present, Oklahoma courts apply an "objective test" and ask whether a "reasonably prudent person, situated as was the

---

[4] In full, § 11-701(A) provides:

> A. Whenever any person driving a vehicle approaches a railroad grade crossing under any of the circumstances stated in this section, the driver of such vehicle shall stop within fifty (50) feet but not less than fifteen (15) feet from the nearest rail of such railroad, and shall not proceed until he can do so safely. The foregoing requirements shall apply when:
> 1. A clearly visible electric or mechanical signal device gives warning of the immediate approach of a railroad train;
> 2. A crossing gate is lowered or when a human flagman gives or continues to give a signal of the approach or passage of a railroad train;
> 3. A railroad train approaching within approximately one thousand five (1,500) hundred feet of the highway crossing emits a signal audible from such distance and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard;
> 4. An approaching railroad train is plainly visible and is in hazardous proximity to such crossing; or
> 5. The tracks at the crossing are not clear.

motorist and exercising ordinary care for his own safety, should have" perceived the signal. *Nye*, 428 P.3d at 874–75 (second quoting *Ross v. Burlington N. & Santa Fe Ry. Co.*, 528 F. App'x 960, 963 (10th Cir. 2013) (unpublished)).

As relevant here, § 11-701(A)(3) requires drivers to stop if "[a] railroad train approaching within approximately [1500] feet of the highway crossing emits a signal audible from such distance and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard." Accordingly, when Malinski failed to stop at the crossing, he violated the statute if a "reasonably prudent" driver in Malinski's position should have heard the signal from approximately 1500 feet.[5] *Nye*, 428 P.3d at 874 (quoting *Ross*, 528 F. App'x at 963). Thus, to meet its prima facie burden of demonstrating that Malinski violated the statute, BNSF must show two things: (1) sufficient distance, i.e., that the train signal sounded approximately 1500 feet

---

[5] Although the statute creates a duty to stop if a "train approaching *within* approximately [1500] feet of the highway crossing emits a signal audible from such distance," § 11-701(A)(3) (emphasis added), the district court interpreted this to mean that the statutory duty to stop is triggered if "the train's horn was audible *at* approximately 1,500 feet," App. vol. 4, 893 (emphasis added); *see also Turnbull v. Mo. Pac. R.R. Co.*, No. CIV-90-1432-R, 1991 WL 544257, at *3 (W.D. Okla. Dec. 10, 1991) (unpublished) (noting that to establish violation of § 11-701(A)(3), "a signal must be audible from 1,500 feet from the crossing"), *aff'd sub nom. Robinson v. Mo. Pac. R.R. Co.*, 16 F.3d 1083 (10th Cir. 1994). And the parties do not dispute this interpretation on appeal. Further, this interpretation accords with jury instructions based on § 11-701(A)(3) that the Oklahoma Supreme Court found "adequate." *Myers v. Mo. Pac. R.R. Co.*, 52 P.3d 1014, 1031 (Okla. 2002) (approving instruction providing that "a motorist is required to stop at a railroad crossing . . . if . . . the train emits a signal audible from approximately 1,500 feet from the crossing"). Thus, we assume that the signal must be audible at, and not merely within, approximately 1500 feet from the crossing in order to trigger a driver's duty to stop under § 11-701(A)(3).

away from the crossing, and (2) audibility, i.e., that the signal sounded loudly enough that a reasonably prudent person at the crossing should have heard it.

As to sufficient distance, the parties do not dispute that the video shows the horn sounded for 15 seconds before the collision. Because the train was moving at 55 miles per hour, we can deduce that this signal began sounding approximately 1210 feet before the crossing.[6] And a signal audible from as close as only 1100 feet triggers a driver's duty to stop under § 11-701(A)(3). *Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1221 (10th Cir. 2008) (concluding it "flies in the face of the plain language of the statute" to argue that driver did not violate § 11-701(A)(3) because train emitted signal 1100 feet and not 1500 feet from crossing because statute requires audibility from only "*approximately*" 1500 feet). Thus, BNSF has established that the signal began sounding approximately 1500 feet from the crossing.

As to audibility, the horn test demonstrates that the signal was audible from that distance.[7] Ten days after the collision, BNSF tested the horn and found that, as

---

[6] The district court reached this same conclusion, and our calculations support it. Converting 55 miles per hour to feet per second, a train traveling at this speed is traveling at 4840 feet per minute and thus travels 1210 feet in 15 seconds.

[7] In addition to the facts discussed here, BNSF presented testimony from a nearby resident who could hear the train from his house, which is located more than 1500 feet from the crossing. The district court relied in part on this testimony in determining that BNSF met its prima facie burden. Malinski and Smith argue that this reliance subverts the reasonably-prudent-driver standard because the testimony merely demonstrates that a local resident sometimes hears the signal from over 1500 feet away from the crossing—not that a reasonably prudent driver in Malinski's position should have heard the signal on the day of the accident. But unlike the district court, we do not find the resident's testimony useful or necessary and thus do

measured at 100 feet in front of the locomotive, the horn's volume was 100.5 decibels. This volume is within the 96- to 110-decibel range (as measured at 100 feet in front of the locomotive) required by FRA regulations, which were designed to provide for audibility from 1320 feet. *See* 49 C.F.R. § 229.129(a); Use of Locomotive Horns at Highway-Rail Grade Crossings, 68 Fed. Reg. 70,586, 70,610, 70,627 (Dec. 18, 2003). Specifically, during the rulemaking process, the FRA sought to "establish and quantify . . . the level of sound that needs to be delivered to be detectable." Use of Locomotive Horns, 68 Fed. Reg. at 70,610. In doing so, it determined that when a horn sounds at a volume of 100 decibels (measured from 100 feet away), that volume "will have diminished to roughly 75 [decibels] at one-quarter mile[, or 1320 feet,] in front of the locomotive," which is "*near* the outer margin of utility in terms of alerting the motorist to oncoming trains at that crossing." *Id.* at 70,627 (emphasis added). But because such a horn signal sounding from 1320 feet away is *near* the outer margin of utility for warning motorists at this distance, it is *within* the margin of utility. And for a signal to be of any utility at all, it must be audible. *See id.* at 70,602 (determining that "[s]ounding the horn [within the required decibel range] over a distance greater than one-quarter mile would add no value, since the loss of volume . . . would almost certainly prevent any effective warning"). Thus, per the rulemaking history, a 100.5-decibel signal (measured from 100 feet away) is audible

not rely on it. Because, as explained below, we find that BNSF meets its prima facie burden even without the resident's testimony, we need not determine whether the district court erred in relying on this testimony.

9

from at least a quarter mile away. And a signal audible from a quarter mile away triggers a driver's duty to stop under § 11-701(A)(3). *See Henning*, 530 F.3d at 1221.

Malinski and Smith do not dispute the results of the horn test. But they do dispute the relevance of the horn test in combination with the FRA decibel-range regulations. They first argue that the regulations are not relevant because they regulate trains rather than drivers. But the significance of the regulations is not BNSF's compliance with them; it is that the rulemaking history demonstrates that a horn sounding at 100 decibels (measured from 100 feet away) is evidence of audibility from approximately 1500 feet.

Next, Malinski and Smith argue that a study underlying the decibel-range regulations is unrepresentative. In particular, they fault the study because in analyzing the safety of crossings, it did not consider whether "railway companies failed to maintain the crossing in a reasonably safe manner," as they alleged BNSF did. Aplt. Br. 27. But the maintenance of the crossing is irrelevant to the conclusion we draw from the FRA's regulations and rulemaking history: that a 100.5-decibel signal is audible from at least quarter mile, or 1320 feet. 68 Fed. Reg. 70,586, 70,627. Thus, like the district court, we find that BNSF's compliance with the FRA decibel-range requirements provides evidence of audibility in this case. And Malinski and Smith's arguments to the contrary fail to undermine that conclusion.[8]

---

[8] Malinski and Smith also argue that the signal was tested "in a train yard, while it was immobile, and during different weather conditions" than those on the day of the collision. Aplt. Br. 29. They contend that these differences make the testing unreliable evidence of what occurred on the day of the accident. But they

Taking the video and testing evidence together, then, the BNSF train signaled at 100.5 decibels (as measured from 100 feet) when it was approximately 1500 feet away from the crossing where it struck Malinski and Nathan Smith. *See Henning*, 530 F.3d at 1221. And because such a signal is audible from that distance, the BNSF signal was audible from approximately 1500 feet at the crossing where the train struck Malinski and Smith. *See id.*; Use of Locomotive Horns, 68 Fed. Reg. at 70,627.

We therefore conclude that BNSF meets its initial burden to make a prima facie demonstration that a reasonably prudent driver in Malinski's position should have heard the signal when the train was approximately 1500 feet away from the crossing. *See Savant Homes, Inc.*, 809 F.3d at 1137. The burden now shifts to Malinski and Smith, who must "identify specific facts that show the existence of a genuine issue of material fact." *Thomas*, 48 F.3d at 484.

In attempting to do so, Malinski and Smith first argue that they raised a genuine issue of material fact when Malinski testified that he could not hear the signal. They contend that the district court misapplied the reasonably-prudent-driver standard when finding otherwise. In doing so, they maintain that when a driver "claims an inability to detect an approaching train—a jury, not the courts—must decide" the issue of audibility. Aplt. Br. 16. But this is a subjective analysis: it asks

---

make this attack on BNSF's testing for the first time on appeal and do not argue for plain-error review. We therefore decline to consider this waived argument. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1127–28 (10th Cir. 2011).

11

whether Malinski actually heard the signal, not whether a reasonably prudent driver in Malinski's situation should have heard it. *See Nye*, 428 P.3d at 875 (explaining that "an objective test is consistent with [the Oklahoma Supreme Court's] long-standing jurisprudence"). Even *Ross*, which Malinski and Smith rely on for this point, frames the inquiry as "whether the train emitted a signal that would have been audible to a *reasonably prudent driver in* [*the driver's*] *position* at the crossing." 528 F. App'x at 966 (emphasis added).

To be sure, Malinski and Smith cite cases that consider witness testimony as a relevant factor when denying summary judgment in § 11-701(A) cases. In those cases, however, either additional evidence corroborated the witness testimony or the railroad had not made a prima facie demonstration that a § 11-703(A) visual or audible signal was present. *See, e.g.*, *id.* (denying summary judgment when multiple witnesses, including crewmembers on train, did not recall hearing train's signal and expert opined that driver's vehicle would have been "significant acoustical barrier" to hearing signal (quoting App. 328)); *Cornwell v. Union Pac. R.R.*, No. 08-CV-638-JHP, 2010 WL 3521668, at *3 (N.D. Okla. Sept. 7, 2010) (unpublished) (denying summary judgment because railroad had not established whether driver was "given notice of the train's approach by way of the sounding of the horn/whistle"). Thus, Malinski's testimony does not raise a factual dispute.

Next, Malinski and Smith contend that the district court impermissibly drew an inference in BNSF's favor by determining that the music playing in Malinski's truck was loud. But Malinski and Smith do not explain how this alleged error affects our

12

analysis here. So although we acknowledge the practical possibility that the volume of music in a vehicle could theoretically impact the audibility analysis (for example, if a reasonably prudent person would listen to music at a passive railroad crossing at such a volume as to impact a signal's audibility), such a possibility is not before us in this case. *See Wilburn v. Mid-S. Health Dev., Inc.*, 343 F.3d 1274, 1281 (10th Cir. 2003) (declining to consider inadequately briefed argument).

Finally, Malinski and Smith argue that the district court ignored the facts that Malinski was driving on a gravel road as he approached the crossing, that it was raining at the time of the collision, that he approached the crossing at dusk, and that the driver who crossed the tracks before Malinski testified that he could not hear the signal. But as BNSF points out, Malinski and Smith did not argue in the district court that any of these facts impacted the signal's audibility, and they do not argue for plain-error review on appeal. Therefore, any arguments based on these allegedly ignored facts are waived. *See Richison*, 634 F.3d at 1127–28; *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 675 (10th Cir. 1998) (upholding summary judgment in part by determining that party waived argument it made on appeal because it did not "raise and support [the] argument below").

Thus, we do not find that either Malinski's testimony or any of Malinski and Smith's other arguments "show the existence of a genuine issue of material fact" as to whether the signal was audible to a reasonably prudent driver. *Thomas*, 48 F.3d at 484. Accordingly, Malinski and Smith have not rebutted BNSF's prima facie demonstration that a reasonably prudent driver in Malinski's position should have

heard the signal from approximately 1500 feet, triggering Malinski's duty to stop under § 11-701(A)(3).[9] And because Malinski did not stop, he violated § 11-701(A)(3). *Nye*, 428 P.3d at 873.

## II. Causation

Even though Malinski violated § 11-701(A)(3), this statutory violation gives rise to negligence per se only if the violation proximately caused the collision that led to his injuries and to Nathan Smith's death. *See id.* Proximate cause is the "cause [that] sets in motion the chain of circumstances leading to the injury." *Akin v. Mo. Pac. R.R. Co.*, 977 P.2d 1040, 1054 (Okla. 1998). Here, BNSF can prevail on summary judgment only if it makes a prima facie demonstration that Malinski's failure to stop in the presence of an audible signal "set[] in motion the chain of circumstances leading to" his injuries and Nathan Smith's death. *Id.*

The video shows that the collision occurred immediately after Malinski failed to stop, without any intervening events. The video therefore establishes a prima facie demonstration that Malinski's § 11-701(A)(3) violation proximately caused the

---

[9] Malinski and Smith argue that a "driver does not solely bear the burden for preventing accidents"; instead, they contend, a "driver's duty to stop depends on whether the railway company first satisfies its duty to maintain its crossing in a reasonably safe manner." Aplt. Br. 17, 20. But this argument misunderstands negligence per se, where the statute defines the duty. *Howard v. Zimmer, Inc.*, 299 P.3d 463, 467 (Okla. 2013) ("The negligence per se doctrine is employed to substitute statutory standards for parallel common[-]law, reasonable[-]care duties."). Here, a driver has a duty to stop when a signal is audible from approximately 1500 feet. § 11-701(A)(3).

14

collision, which in turn caused Malinski's injuries and Nathan Smith's death. The burden now shifts to Malinski and Smith to rebut this prima facie demonstration.

In attempting to meet their burden, Malinski and Smith argue that summary judgment is not appropriate because (1) BNSF's negligence in maintaining the crossing proximately caused Malinski's injuries and Nathan Smith's death and (2) there are genuine issues of material fact as to whether any negligence on Malinski's part, in violating § 11-701(A)(3), supervened that cause. A supervening cause "is a new, independent[,] and efficient cause of the injury [that] was neither anticipated nor reasonably foreseeable" and breaks the chain of causation between an otherwise proximate cause and the injury. *Id.* at 1054–55. Malinski and Smith argue that there are fact issues as to (1) whether Malinski's "inability to hear the train was *independent* from BNSF's negligent maintenance, building, and construct[ion] of the crossing" and (2) whether Malinski's decision to cross the tracks without stopping was "*reasonably foreseeable* considering BNSF's negligent conduct." Aplt. Br. 35 (emphases added). Thus, they reason, summary judgment is not appropriate because of fact issues as to whether Malinski's alleged negligence broke the chain of proximate causation between BNSF's alleged negligence and the injuries.

This argument fails because, as a matter of law in Oklahoma, a driver's violation of § 11-701(A) proximately causes injuries from resulting train collisions. *Akin*, 977 P.2d at 1055; *Hamilton v. Allen*, 852 P.2d 697, 701 (Okla. 1993). This remains true "even if" the railroad "could have been shown to be [in] breach of its common-law duty of care." *Akin*, 977 P.2d at 1056. In Oklahoma, a driver's violation

15

of § 11-701(A) "constitutes a supervening act of negligence [that] insulates the railroad from the legal consequences of its own lack of due care, if any." *Id.*; *see also Hamilton*, 852 P.2d at 700–01 (explaining that when "it is undisputed that warnings were given," the issue of proximate cause "becomes one of law").

Malinski and Smith argue that *Hamilton* and *Akin* are inapposite because the collisions in those cases occurred at crossings with visual active-warning systems such as crossing gates. However, they do not explain why or how the proximate-cause analysis should differ based on whether the crossing was passive or active or whether the signals were visual or audible. Indeed, § 11-701(A) creates a duty to stop both in the presence of active visual signals, § 11-701(A)(1)–(2), and in the presence of an audible signal, § 11-701(A)(3). They also attempt to distinguish these cases because they involve instances where the driver obviously "broke the law" by, for example, driving along the center line past two stopped cars and lowered crossing gates in order to cross the tracks. Rep. Br. 13; *see Hamilton*, 985 P.2d at 698–99. But even if Malinski's failure to stop was not as egregious as that in *Hamilton*, he nevertheless violated the statute. Accordingly, *Hamilton* and *Akin*'s conclusion that a § 11-701(A) violation is the proximate cause for any resulting injuries applies equally here.

The three cases Malinski and Smith rely on do not say otherwise. First, none of the cases address the legal rule that a § 11-701(A) violation supervenes any negligence on the part of a railroad. Next, two of these cases are not negligence-per-se cases and instead involved situations where it was unclear whether any warning

16

signal was present. *See Kan., Okla. & Gulf Ry. Co. v. Collins*, 251 P.2d 178, 180 (Okla. 1952) (finding proximate cause was jury question when "evidence as to whether or not the whistle was blown or bell rung when the train approached the crossing [was] in conflict"); *Okla. Union Ry. Co. v. Lynch*, 242 P. 176, 178 (Okla. 1925) (denying summary judgment when "the evidence was very conflicting . . . as to whether or not any signal warning was given"). These two cases are not relevant here because, as explained above, Malinski and Smith have failed to rebut or call into question BNSF's prima facie demonstration that the signal was audible. And thus—unlike *Collins* and *Lynch*—this case must be analyzed as a per-se-negligence case, where the statutory violation proximately causes the injury as a matter of law. Finally, in the third case, the court found that a jury must determine whether a police officer's negligence in violating a law that required him to use an audible signal before crossing a highway median proximately caused a multi-car collision. *See Jackson v. Jones*, 907 P.2d 1067, 1072 (Okla. 1995). But in that case, multiple actors intervened between when the officer crossed the median without an audible signal and when the collision occurred. *Id.* at 1070. Here, there are no other actors who may have supervened Malinski's negligence, so *Jackson*, too, is inapposite.

In sum, then, Malinski and Smith fail to rebut or call into question BNSF's prima facie demonstration that Malinski's § 11-701(A)(3) violation proximately caused the collision that led to his injuries and Nathan Smith's death.

17

## Conclusion

Through the video and horn test, BNSF made a prima facie demonstration that the train signal, when sounded approximately 1500 feet away from the crossing, was audible to a reasonably prudent driver in Malinski's position at the crossing. Because we find that Malinski and Smith did not provide evidence sufficient to create a genuine issue of material fact on this issue, we conclude that Malinski violated § 11-701(A). And because under Oklahoma law a driver's violation of § 11-701(A) acts as a supervening cause to any negligence on a railroad's part, we find that Malinski's negligence proximately caused the collision that led to Malinski's injuries and Nathan Smith's death. Thus, we affirm the district court's order ruling that Malinski was negligent per se and granting summary judgment to BNSF.[10]

Entered for the Court

Nancy L. Moritz
Circuit Judge

---

[10] BNSF argues in the alternative that the Federal Railroad Safety Act preempts Malinski and Smith's state-law claims. Because we affirm the district court's grant of summary judgment on negligence per se, we do not reach this argument.